MARSHALL FIELD STORES, INC.,
Bonnie Beirne, and Susan
Varga, Appellants,

v.

Gary W. GARDINER, Appellee.

No. 01–90–00304–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

March 18, 1993.

Opinion Overruling Motion for
Rehearing July 29, 1993.

Andrew T. McKinney, Houston, for appellants.

Lois Watson, Watson, Watson & Hlavinka, Houston, for appellee.

Before SAM BASS, O'CONNOR and WILSON, JJ.

## OPINION

WILSON, Justice.

In April 1986, Marshall Field Stores, Inc., acting through employees Bonnie Beirne and Susan Varga, terminated Gary Gardiner from his sales job with one of its Houston stores. The dismissal resulted from Gardiner's failure to account for a missing $100 bill to management's satisfaction, and in Gardiner's view, the "firing" branded him as a thief. According to Gardiner's testimony, his several attempts at communication with Marshall Field after his discharge, made in an effort to vindicate himself, were rebuffed and ignored. Ultimately, Gardiner filed this lawsuit.

In the trial court, Gardiner (the appellee), sued Beirne, Varga, and Marshall Field, (the appellants), asserting a claim for damages proximately caused by the nonprivileged communication of defamatory statements about Gardiner regarding the incident. The jury found that Beirne and Varga, in the course and scope of their employment, made malicious publications of unspecified defamatory statements regarding Gardiner to another unnamed employee, or employees, of Marshall Field. After finding Marshall Field ratified the malicious publications, the jury determined actual and exemplary damages in a total amount exceeding one million dollars.

We reject the appellants' argument that the appellee's claims are barred by limitations, but after consideration of the appellants' points of error relative to the sufficiency of the evidence, we reverse the judgment of the trial court and render judgment that the appellee take nothing.

Gardiner was working as a salesperson in the men's department on April 17, 1986, when a security surveillance camera videotaped someone identified by the appellants as Gardiner at a register outside the area of his immediate responsibility. The video, as interpreted by the appellants, showed Gardiner ring up a "no sale," remove, and then replace bills in the "large bills" drawer ($100's, $20's and checks). The video also showed the person depicted leaving the area with a $100 bill in his hand. The same register came up "short" $100 when receipts were balanced with sales that evening.

The cash register journal tape taken from the register on the day in question indicated it had been opened at one point for a "no sale" transaction. Each employee using the machine entered a unique number as part of the procedure for opening the register. The employee number

entered was printed on the tape by each specific transaction. The employee number on the tape for the transaction in question was acknowledged by Gardiner to be his.

On Friday, April 25, 1986, Marshall Field's security manager, Susan Varga, approached Gardiner on the sales floor and requested he accompany her to her office. Varga, who had conducted an investigation into the missing $100, then interviewed Gardiner in private about the incident. Gardiner told her he did not remember the specific transaction, which had taken place several days earlier, but he did not take any money. He then requested a polygraph test. The polygraph test was administered the same day, and the examiner gave an immediate report of failure. However, the final written report introduced at trial stated Gardiner had failed to clear the test, meaning the examiner could not determine the truthfulness of his responses.

After the polygraph test, Varga showed Gardiner the segment of the surveillance tape depicting the suspect transaction. Gardiner then made a written statement that he did not recall the transaction shown to him, but by viewing the tape, he was able to reconstruct what had likely happened. He stated he left his usual register with a $100 bill in his hand, because he could not make change, and was looking in the register displayed on the video for change. Gardiner did not acknowledge he was the person filmed at the register, and again vigorously reiterated he did not take $100 from Marshall Field for his own use.

Following the interview, Varga instructed Gardiner to go home. The next day, Beirne called Gardiner and told him he was suspended pending a final decision. A few days later, on April 29, 1986, Gardiner was fired.

Gardiner's original petition, filed on March 27, 1987, alleged Marshall Field employees published defamatory statements to the Texas Employment Commission, the Retail Merchant's Association, and other employees of Marshall Field. Gardiner's first amended original petition, filed October 10, 1988, alleged that a Marshall Field employee made slanderous statements to a third party, and that Marshall Field compelled Gardiner to self-publish the statements to prospective employers. His second amended original petition, filed September 18, 1989, alleged publication of false statements to employees of Marshall Field and to a Marshall Field's lessee. He also reasserted his claim that he was compelled to self-publish to prospective employers. In Gardiner's answer to Marshall Field's special exceptions, he specified Marshall Field's lessee was Leroy Bauer, and the prospective employer referred to was Joan Buchanon.

■ In points of error one and two, the appellants contend the trial court erred in entering judgment in favor of Gardiner and in denying their motion for judgment notwithstanding the verdict, because Gardiner's claims were time barred. The appellants argue the defamatory publications alleged in both the first amended original petition and the second amended original petition were time barred as a matter of law, and therefore, there was no issue that could go to the jury.

■ The record shows certain Marshall Field employees first became aware of an investigation of Gardiner on April 25, 1986, the same day Gardiner was first confronted about what the appellants claimed the videotape revealed. The statute of limitations for slander is one year. TEX.CIV. PRAC. & REM.CODE ANN. § 16.002 (Vernon 1986). The period of limitations begins to run from the date the cause of action accrues. *Id.* A cause of action for slander accrues when the injured party learned of, or in exercise of reasonable diligence should have learned of, the defamatory communication. *Kelley v. Rinkle*, 532 S.W.2d 947, 949 (Tex.1976); *Johnson v. Abbey*, 737 S.W.2d 68, 69–70 (Tex.App.–Houston [14th Dist.] 1987, no writ). Each distinct publication of slander inflicts an independent injury from which a slander cause of action may arise. *Fisher v. Beach*, 671 S.W.2d 63, 67 (Tex.App.—Dallas 1984, no writ).

The appellants concede Gardiner's original petition was filed within the statute of limitations. However, Gardiner's first and

second amended petitions were filed outside the statute of limitations. The appellants argue the first and second amended petitions superseded and supplanted the original petition, and were filed after the statute of limitations had run. The appellants assert the causes of action alleged in the subsequent pleadings were time barred.

Gardiner argues that under the TEX.CIV. PRAC. & REM.CODE ANN. § 16.068 (Vernon 1986), his amended pleadings relate back to his original petition, and therefore the statute of limitations cannot be raised with respect to the causes of action alleged in the amended pleadings. Section 16.068 states that a subsequent amendment to a pleading changing the facts or grounds of liability is not subject to a plea of limitation, unless it is wholly based on a new, distinct, or different transaction or occurrence. TEX.CIV.PRAC. & REM.CODE ANN. § 16.068 (Vernon 1986).

The basic liability question submitted to the jury was as follows:

Do you find from a preponderance of the evidence that between the dates of 4–18–86 and 4–18–87 [Bonnie Beirne and/or Susan Varga], while in the course and scope of their employment for Marshall Field Stores, Inc., published defamatory statement(s) to employee(s) of Marshall Field Stores, Inc., who did not have a qualified privileged to make or receive such a publication about Gary W. Gardiner?

Gardiner filed three pleadings alleging publication of various slanderous statements. If an allegation of a slanderous publication contained in each of the three pleadings would support the jury question submitted, then that allegation would in no sense have been abandoned, and the "relation back" rules would not be applied. The relevant portions of the three pleadings are:

PLAINTIFF'S ORIGINAL PETITION:

Defendants Beirne and Varga, at all relevant times were the agents and employees of Defendant Marshall Field and acted within the course and scope of such agency and employment. . . .

Plaintiff believes that Defendants have not only published libelous material and repeated slanderous statements to the [Texas Employment Commission] and among employees of Marshall Field. . . . Such action by the Defendants has caused Plaintiff to be "branded" as a thief.

PLAINTIFF'S FIRST AMENDED ORIGINAL PETITION:

Defendants, Beirne and Varga, at all relevant times were the agents and employees of Defendant, Marshall Field Stores, Inc. and acted within the course and scope of such agency and employment. On or about April 25, 1986, Plaintiff was accused of mishandling funds belonging to his employer, Marshall Field Stores, Inc. . . . . This accusation was made by Defendant Varga. Mr. Gardiner was fired. Subsequently, it was reported by an employee of Defendant Marshall Field Stores, Inc. to a third party that Mr. Gardiner had been fired for theft, stealing or words to that effect. . . .

PLAINTIFF'S SECOND AMENDED ORIGINAL PETITION:

Varga and Beirne, Personnel Manager for Marshall Fields, at all relevant times were agents and employees of Marshall Fields and acted within the course and scope of such agency. . . .

Defendants published the false statements to employees of Marshall Fields who were capable of understanding their defamatory import and who had no duty to investigate security matters or to terminate employees and who did so understand the defamatory import.

■ In its simplest form, a cause of action for slander arises when a person orally makes a defamatory statement about a second person to a third person. In his first amended petition, Gardiner stated that "it was reported by an employee of Defendant Marshall Field Stores, Inc. *to a third party* that Mr. Gardiner had been fired for theft, stealing or words to that effect." Given the general nature of the allegation, we find the pleading sufficient to put Marshall

Field on fair notice that the claimed publication of slanderous statements could refer to statements made to employees of Marshall Field who were not privileged to receive such a publication.

We find the general phrase, "a third party," includes an unprivileged employee of Marshall Field. The first amended petition, therefore, does not necessarily constitute a different publication from the allegation in Gardiner's more specific original petition. Gardiner also raised this same event of publication in his second amended petition, which was his final and trial petition.

Because each pleading could support the issue ultimately presented to the jury, there is no necessity to apply the relation back doctrine. We hold the cause of action upon which liability was found by the jury was not abandoned in Gardiner's subsequent pleadings and no limitations defense directed against Gardiner's basic allegation of defamatory publication by privileged to nonprivileged Marshall Field employees has merit. Accordingly, points of error one and two are overruled.

In point of error three, Marshall Field contends the trial court erred in entering judgment, or in failing to grant a new trial, because the evidence was legally and/or factually insufficient to support a jury verdict for Gardiner on the element of publication as defined in the basic liability issue submitted to the jury as set-out above.

■■■ In reviewing legal insufficiency points, the reviewing court considers only the evidence and inferences, when viewed in their most favorable light, that tend to support the finding, and disregards all evidence and inferences to the contrary. *Davis v. City of San Antonio,* 752 S.W.2d 518, 522 (Tex.1988); *Stafford v. Stafford,* 726 S.W.2d 14, 16 (Tex.1987). If there is any evidence of probative force to support the finding, the point must be overruled and the finding upheld. *Sherman v. First Nat'l Bank,* 760 S.W.2d 240, 242 (Tex. 1988).

■■■ In reviewing a factual sufficiency challenge, the reviewing court must consider and weigh all of the evidence, and should set aside the verdict only if the evidence is so weak or the finding is so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Cain v. Bain,* 709 S.W.2d 175, 176 (Tex.1986); *Otis Elevator Co. v. Joseph,* 749 S.W.2d 920, 923 (Tex.App.—Houston [1st Dist.] 1988, no writ). Because the jury is the sole judge of the credibility of the witnesses and the weight to be given their testimony, the appellate court may not substitute its opinion for that of the jury merely because it might have reached a different fact conclusion. *Herbert v. Herbert,* 754 S.W.2d 141, 144 (Tex.1988); *Rego Co. v. Brannon,* 682 S.W.2d 677, 680 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.).

■■■ Actionable slander is defined as a defamatory statement orally communicated or published without legal excuse. *Diaz v. Rankin,* 777 S.W.2d 496, 498 (Tex. App.—Corpus Christi 1989, no writ); *Diesel Injection Sales & Serv., Inc. v. Renfro,* 656 S.W.2d 568, 573 (Tex.App.—Corpus Christi 1983, writ ref'd n.r.e.). Publication of defamatory words means to communicate orally to some third person capable of understanding their defamatory import and in such a way that he did so understand. *Houston Belt & Terminal Ry. v. Wherry,* 548 S.W.2d 743, 751 (Tex.Civ.App.—Houston [1st Dist.] 1977, writ ref'd n.r.e.).

■■■ Publication is viewed in light of the surrounding circumstances. *Musser v. Smith Protective Serv., Inc.,* 723 S.W.2d 653, 655 (Tex.1987). If a reasonable person would recognize that an act creates an unreasonable risk that the defamatory matter will be communicated to a third party, the conduct becomes a negligent communication, which amounts to a publication just as effectively as an intentional communication. *First State Bank of Corpus Christi v. Ake,* 606 S.W.2d 696, 701 (Tex.Civ.App.—Corpus Christi 1980, writ ref'd n.r.e.) (quoting RESTATEMENT (SECOND) OF TORTS § 577, cmt. k (1977)). Publication through conduct occurs when the communication to another is made and understood without a statement in words. *Reicheneder v.*

*Skaggs Drug Center,* 421 F.2d 307, 312 (5th Cir.1970) (accused taken from store by police in view of employees who had been told that a shoplifter was in custody).

During trial, Gardiner alleged several defamatory publications regarding his termination. Gardiner testified that Diane Fargo, Johnny Young, Jan Kirby, and Mini Lobo, all Marshall Field employees, telephoned him at home on April 25, 1986, and said they knew what had happened. Alberto Farnos, a Marshall Field sales associate, testified that a few days after Gardiner was fired, another Marshall Field employee told him that Gardiner had been let go for taking money from a cash register. Diane Fargo, who worked in the men's department, testified that it was all over the store that Gardiner took money out of the register, and everyone was talking about it. Neither Fargo, Young, Kirby, Lobo, nor Farnos, identified Beirne, Varga, or anyone else as the source of the information, whether in direct testimony or through Gardiner.

Leroy Bauer, the manager of the beauty salon leasing space within Marshall Field, testified that at some point within six months after the incident, he heard statements regarding Gardiner's termination from one of the executives at Marshall Field. He stated that either Varga or Pat Rowen, Beirne's assistant, told him, but he could not remember who it was specifically.

Gardiner testified he was compelled to make a self-publication of the Marshall Field defamatory statement, in order to explain his termination from Marshall Field, when he was offered a job by Joan Buchanon. Buchanon, a vice-president of L.S. Ayers, testified that in May of 1986, Gardiner told her he had been let go from Marshall Field because he was accused of taking money. Buchanon confirmed she wanted Gardiner to work for the L.S. Ayers firm until the information was revealed why Gardiner left Marshall Field.

While both parties, in their briefs, include arguments dealing with the publication made to Leroy Bauer, and the alleged self-publication made to Joan Buchanon, these specific publications were excluded from the jury charge. Further, Bauer and Buchanon were not employees of Marshall Field as required by the question submitted to the jury. Any evidence of publication to them considered in isolation, therefore, could not be direct evidence of publication to nonprivileged employees of Marshall Field.

No witness testified that either Varga or Beirne told any Marshall Field employee directly that Gardiner stole money from a register, or made any other type of defamatory statement. Further, no one testified they overheard a conversation where such information was communicated by Varga or Beirne to anyone else. Finally, no one testified about any conversation in which Varga or Beirne was alleged to be the source of any such information.

In Gardiner's own testimony, he did not claim any conversation where anyone related anything to him about direct statements made by Varga and Beirne to any employee of Marshall Field. Therefore, lacking any direct evidence of defamatory publications by Varga and/or Beirne to any employee of Marshall Field as required by the question submitted to the jury, the affirmative finding reached by the jury necessarily had to be based on circumstantial evidence. For circumstantial evidence to raise a fact issue, a reasonable person must be led by the evidence to conclude that the existence of the fact is more reasonable than its nonexistence. *Smith v. Tennessee Life Ins. Co.,* 618 S.W.2d 829, 834 (Tex.Civ.App.—Houston [1st Dist.] 1981, no writ). Further, where two inferences are equally likely, neither inference may be drawn. *Litton Indus. Prod., Inc. v. Gammage,* 668 S.W.2d 319, 324 (Tex.1984).

We note that a substantial portion of the evidence relied upon by the appellee to support the verdict is outside the parameters of the question asked of the jury. The special issue inquired whether the jury found from a preponderance of the evidence that:

A) between the dates of 4–18–86 and 4–18–87,

B) **Bonnie Beirne and/or Susan Varga,**
C) while in the course and scope of their employment with Marshall Field Stores, Inc.
D) published defamatory statements,
E) **to (non-privileged) employees of Marshall Field Stores, Inc.**

In his brief, Gardiner segregates the trial evidence into four categories, which we adopt in analyzing appellant's no evidence point of error. Gardiner's evidentiary categories are:

1) Johnny Young, Mini Lobo, Diane Fargo, and Jan Kirby.
2) Jose Mascorieto and Leroy Bauer.
3) Publication by conduct.
4) Compelled publication.

## EVIDENCE REGARDING YOUNG, LOBO, FARGO & KIRBY

Gardiner testified that on Friday, April 25, 1986, the day he was accused of taking money from the cash register, the only people he talked to before leaving the store were Varga, the security manager; Beirne, the personnel manager; and Sue Davis, Gardiner's supervisor. On the twenty-fifth, Varga removed Gardiner from his duty on the sales floor, asked him to view the video tape, questioned him about the missing money, took him to take a polygraph test, and after returning from the test, questioned him further. After the interview, Varga told Gardiner to go home and get some rest. On his way out, he ran into his supervisor, Sue Davis. Gardiner testified that Sue Davis said she knew all about it, and she felt terrible, and asked if there was anything she could do. Gardiner testified he said nothing to Sue Davis about his transaction with Varga, but she already knew about it. Sue Davis testified she never talked to either Varga or Beirne about Gardiner.

Gardiner next testified that four of his fellow employees, Diane Fargo, Johnny Young, Jan Kirby, and Mini Lobo, telephoned him at home the evening of April 25, 1986 and told him they "knew" what had happened. Gardiner testified Mini Lobo told him she knew he left the floor with Varga and had not returned, and the whole store was buzzing about it. Gardiner stated he did not know where his co-workers got their information.

Diane Fargo, the only one of the four actually called as a witness at trial, testified it was all over the store Gardiner took money out of the register. She stated she could not remember exactly who told her, or where they heard it from, but everyone was talking about it, and Gardiner was not the one who told her. Fargo also testified she knew Gardiner had taken money by Varga's actions of taking him off the floor, because that was the only time anything like that was ever done.

Fargo testified she did not speak to Beirne about Gardiner. Fargo further stated she started a conversation with Varga some time after the twenty-fifth, telling Varga she was certain Gardiner had not taken anything, and suggested someone else as a possible suspect. Fargo testified Varga said she was probably right, and she would watch the other person.

## JOSE MASCORIETO AND LEROY BAUER

The evidence given by Mascorieto and Bauer was of events within the relevant time period. Neither worked for Marshall Field, but were employed by a sub-lessee (Seligman & Latz) that operated a hair salon within the Marshall Field store in question.

Mascorieto, a friend of Gardiner, was an officer with Seligman & Latz, the owner and operator of the leasehold in question. Mascorieto, who was out of town on the day Gardiner was terminated, testified he heard of the accusation about Gardiner from the hairdresser-manager in the salon (Bauer), and that he talked to no one at Marshall Field about the incident.

Bauer testified "an executive" at Marshall Field, either Varga, or Pat Rowen (Beirne's assistant) told him of the circumstances surrounding Gardiner's dismissal. Bauer was not certain whether Varga or Rowen told him, but related he frequently discussed happenings within the store with Varga. Varga was Bauer's regular customer in the beauty salon, as were Beirne

and Rowen, plus 10 to 15 other employees of Marshall Field. Bauer also stated he overheard other Marshall Field employees speaking of Gardiner's firing, but denied discussing it with any other Marshall Field employees himself.

There is no evidence in the Mascorieto–Bauer testimony of any publication to a Marshall Field employee as required in the charge. Even accepting Bauer's speculation of who told him about Gardiner as some evidence Varga told him, there remains no evidence that such a publication to Bauer reached a Marshall Field employee as required by the charge. Bauer specifically denied speaking about Gardiner's discharge with other Marshall Field employees. Finally, there is no jury issue or instruction submitted to the jury inquiring as to whether any alleged statement made by Varga to Bauer was an act creating an unreasonable risk of the communication of a defamatory publication to an employee of Marshall Field.

## PUBLICATION BY CONDUCT

We find no claim by the appellee that the conduct of the appellants was sufficient to prove a publication of a defamatory statement other than Varga's actions of removing Gardiner from the sales floor and taking him through an exit known by store personnel as one used to transport persons thought to be stealing. Gardiner claims this nonverbal conduct was sufficient to prove Varga published the accusation he had taken money. These events took place on April 25 but are outside the scope of the question asked of the jury even if they are sufficient, in and of themselves, to prove a publication.

The jury was given the following instruction with special issue one:

"Publication" means to communicate defamatory **words** to a person in such a way that he or she understands the **words** to be defamatory. Publication does not include any defamatory statement that Gary W. Gardiner invited, procured, authorized or consented to.

(Emphasis added.)

Publication of defamatory words means to communicate orally (or in writing or print) to some third person capable of understanding their defamatory import and in such a way that he did so understand. *Wherry*, 548 S.W.2d at 751. We find the instruction given to the jury did not authorize a finding of publication by mere conduct as now argued by the appellee.

## COMPELLED PUBLICATION

All parties agree Joan Buchanon was not an employee of Marshall Field, but worked for L.S. Ayers. The evidence suggested by the appellee to prove a compelled publication is also outside the scope of the question presented to the jury for its consideration, again because even if it was compelled, it was not made to an employee of Marshall Field. We find the evidence of "compelled publication" is no evidence in itself to support the jury answer to the liability question asked.

## OTHER WITNESSES

Albert Farnos, a Marshall Field employee, testified about how the "short" register had been closed. Farnos stated he had heard Gardiner had been let go for taking money from the register. Farnos said he got the information from another Marshall Field sales associate a few days after Gardiner's dismissal, but that he had never talked with Varga or Beirne about Gardiner's situation.

## SUMMARY

Gardiner suggests a general theory of the case to overcome the appellants' no evidence point. Gardiner testified he didn't tell anyone other than his mother of the events leading up to his dismissal, but Gardiner found everyone around the Marshall Field store somehow "knew" virtually immediately he was accused of being a thief. Because the jury was entitled to believe Gardiner's statements that he told no one of the accusation, and that his testimony was not contradicted or rebutted, Gardiner asserts it necessarily follows Varga and/or Beirne, the only ones with knowledge of the incident, must have improperly published information about his

firing. How else could his co-workers know what had happened?

Gardiner's suggested theory leading to liability for Marshall Field is based on circumstantial evidence. We find the inferences drawn from the circumstantial evidence relevant to the issue submitted to the jury equally likely to support a different theory of the case. The evidence is equally consistent, if not of a greater weight, with the proposition Gardiner suffered injury because of a circulation of rumors and gossip among store employees probably triggered by Gardiner's removal by Varga and his continued absence from the selling floor.

After considering the record in its entirety, we find there is no evidence relevant to the jury question asked establishing how the store employees "knew," if they did, that Gardiner had been accused of being a thief. With no direct evidence of any publication by Varga or Beirne, and the circumstantial evidence equally likely to support a different theory, we find the evidence legally insufficient to uphold the jury verdict. For circumstantial evidence to raise a fact issue, a reasonable person must be led by the evidence to conclude that the existence of the fact is more reasonable than its nonexistence. *Smith v. Tennessee Life Ins. Co.*, 618 S.W.2d 829, 834 (Tex.Civ.App.— Houston [1st Dist.] 1981, no writ). Further, where two inferences are equally likely, neither inference may be drawn. *Gammage*, 668 S.W.2d at 324.

We reverse the judgment of the trial court and render judgment that the appellee, Gary Gardiner, take nothing.

### OPINION ON MOTION
### FOR REHEARING

WILSON, Justice.

We overrule the appellee's motion for rehearing and his motion to retax costs, but issue this opinion to clarify certain portions of our original opinion.

■ The appellee, Gary W. Gardiner, contends this Court applied an incorrect standard of review when it sustained the appellants' no evidence point of error. Gardiner asserts this Court disregarded inferences favorable to his claim and substituted its opinion for that of the jury. Specifically, Gardiner again points to testimony that everyone "knew" about the incident in question to infer that he was defamed by Beirne or Varga. Thus, he asserts, there was sufficient circumstantial evidence to support the jury's finding he was defamed.

■ When considering a no evidence point, an appellate court may consider only the evidence and inferences favorable to the jury's verdict. *Davis v. City of San Antonio*, 752 S.W.2d 518, 522 (Tex.1988). We understand the meaning of the term "inference" as follows:

> In the law of evidence, a truth or proposition drawn from another which is supposed or admitted to be true. A process of reasoning by which a fact or proposition sought to be established is deduced as a logical consequence from other facts, or a state of facts, already proved....

BLACK'S LAW DICTIONARY 700 (5th ed. 1979).

■ For a jury to infer a fact, it must be able to deduce that fact as a logical consequence from other proven facts. Gardiner argues that because only he, Varga, and Beirne knew initially that he was accused of theft and he did not tell other Marshall Field employees, the logical consequence is that Varga or Beirne must have told them. Therefore, he asserts, the jury was entitled to make that inference.

■ Gardiner overlooks the equally plausible deduction, which he himself asserted as evidence of a publication in his appellate brief, that the other employees knew of the accusation because they saw Gardiner being removed from the sales floor by security. When circumstances are consistent with either of two facts and nothing shows that one is more probable than the other, neither fact can be inferred. *Litton Indus. Prod., Inc. v. Gammage*, 668 S.W.2d 319, 324 (Tex.1984). Because the circumstances proven are as consistent with nonpublication by Varga or Beirne as they are with publication, and nothing shows one was more probable than the

other, the jury was not entitled to infer publication.

 This is not a case in which some circumstantial evidence points in one direction, and other circumstantial evidence points in the opposite direction. In cases involving conflicting evidence, the jury is the sole arbiter of which evidence should be believed. *See Herbert v. Herbert,* 754 S.W.2d 141, 144 (Tex.1988); *Rego Co. v. Brannon,* 682 S.W.2d 677, 680 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.).[1]

This is a case in which the uncontroverted, circumstantial evidence most favorable to the jury verdict is equally susceptible to conflicting inferences. We find no evidence tending to show more forcefully that Gardiner was defamed than not. There was no direct evidence of publication by either Varga or Beirne. Every piece of circumstantial evidence relied on by Gardiner to infer publication equally supports the inference that this knowledge was gained from mere rumors or gossip spread by other store employees.

> An ultimate fact may be established by circumstantial evidence, but the circumstances relied upon must have probative force sufficient to constitute a basis of legal inference. It is not enough that the facts raise a mere surmise or suspicion of the existence of the fact or permit a purely speculative conclusion. The circumstances relied on must be of such a character as to be reasonably satisfactory and convincing, and must not be equally consistent with the nonexistence of the ultimate fact.

*Texas Dep't of Corrections v. Jackson,* 661 S.W.2d 154, 157 (Tex.App.—Houston [1st Dist.] 1983, writ ref'd n.r.e.).

Given that the circumstances proven in this case provide no more than a suspicion or surmise that publication occurred, we reaffirm our holding that the jury was not entitled to reach a speculative conclusion on this issue.

Gardiner also contends the evidence relied on in our original opinion departs materially from the record. He cites the following statement in our original opinion:

> Fargo testified she did not speak to Beirne about Gardiner. Fargo further stated she started a conversation with Varga some time after the twenty-fifth, telling Varga she was certain Gardiner had not taken anything, and suggested someone else as a possible suspect. Fargo testified Varga said she was *probably* right, and she would watch the other person. (Emphasis added.)

The record reflects portions of Ms. Fargo's deposition testimony were read at the trial:

> Mr. McKinney: My offer begins on page 40, line 23.
>
> Q: "First of all, have you ever had a conversation with Bonnie Beirne or—bad question. Did you have a conversation with Bonnie Beirne concerning the circumstances under which Mr. Gardiner separated from Marshall Field back in April or May of 1986?
>
> A: No, I did not.
>
> Q: Did you have a similar conversation with Susan Varga about that circumstance under which Mr. Gardiner separated from Marshall Field back in April or May of 1986?
>
> A: The circumstances? You mean did we—did I say—was he—I don't think he took the money or—
>
> Q: Did you talk to Ms. Varga about Gary Gardiner leaving Marshall Field?
>
> A: It seems to me I told her about Mike Rose when we were discussing that. I may have said something like that.
>
> Q: Did Ms. Varga say anything to you about Gary Gardiner?

---

1. Gardiner cites *Benoit v. Wilson,* 150 Tex. 273, 239 S.W.2d 792 (1951), and *INA of Texas v. Torres,* 808 S.W.2d 291 (Tex.App.—Houston [1st Dist.] 1991, no writ), for the proposition that jury verdicts in cases involving conflicting evidence and inferences may not be set aside by an appellate court. Unlike the present case, *Benoit* and *Torres* involved conflicting evidence. *See*

239 S.W.2d at 797 ("The jury in this case has considered all the facts admitted before it and has, by its answers, *selected from the conflicting evidence* and conflicting inferences that which it considered most reasonable."); 808 S.W.2d at 293 ("The jury *heard extensive conflicting evidence* on the relationship between Torres and Overland.").

A: That was awhile back. I—I—it would be very difficult for me to say absolutely, positively."

Mr. McKinney: That concludes my offer at page 41, line 19.

Ms. Watson: Plaintiff will commence on page 41, lines 20 to 25.

Q: "As you sit here today, do you recall any statements made by Mrs. Varga or Ms. Varga concerning Gary Gardiner and the circumstances under which he left?

A: Well, since she brought to mind Mike Rose and she, meaning this attorney, brought Mike Rose, it seems that I—I do remember now it was a very short—"

Ms. Watson: Page 42, lines 1 through 18.

A: "—conversation, that I told her that I really didn't think Gary took anything, but that Mike Rose was the one that took the money.

Q: Yes, ma'am. I understand that's something that you said to Ms. Varga.

A: Right.

Q: Okay. Now, has Ms. Varga ever said anything to you about Gary Gardiner that you can recall sitting here today?

A: Not—no, she made some comment about she was sure she was right, but she would watch Mike.

Q: All right. And where was this conversation that you had with Ms. Varga?

A: On the selling floor.

Q: And did you initiate the conversation or did Ms. Varga initiate the conversation? Who started the conversation?

A: Oh, I'm sure I did."

Ms. Watson: That concludes plaintiff's offer.

Gardiner contends this Court's opinion did not accurately summarize this testimony, and that the testimony is evidence of publication by Varga.

 We conclude our statement from the record is accurate, with the sole and immaterial exception that we should have used the word "sure" where we used the word "probably." Further, we conclude the cited exchange is no evidence of publi-

cation by Varga. Varga's statement that "she was sure she was right" does not necessarily infer a defamatory publication about Gardiner, particularly because Varga did not say what she was "right" about.

The appellee's motion for rehearing is overruled. Further, Gardiner's motion to retax costs is denied.