**Opinion issued November 29, 2012.**



In The

# Court of Appeals

For The

# First District of Texas

———————————

### NO. 01-10-00963-CV

———————————

### JESSICA BHAN, Appellant

### V.

### BRYAN JAMES DANET AND WILLIAM TODD KRANZ, Appellees

On Appeal from the 313th Judicial District Court
Harris County, Texas
Trial Court Case No. 2007-60263

## O P I N I O N

Appellees, Bryan James Danet and William Todd Kranz, have filed a motion for rehearing and a motion for en banc reconsideration. *See* TEX. R. APP. P. 49.3, 49.7. We deny Danet and Kranz's motion for rehearing. And a majority of the Court has voted to deny their motion for en banc reconsideration. We withdraw

our April 12, 2012 opinion, substitute this opinion in its place, and vacate our April 12, 2012 judgment.

Appellant, Jessica Bhan, challenges the trial court's August 4, 2010 order, entered after a jury trial, appointing Danet and Kranz as the sole managing conservators of Bhan's minor child.[1] In her first two issues, Bhan contends that the evidence is legally and factually insufficient to support the jury's finding that her appointment as sole managing conservator would significantly impair the child's physical health or emotional development and the trial court erred in not allowing her to present testimony from out-of-state witnesses via telephone. In her third issue, Bhan requests that this Court enforce the parties' partial-settlement agreement, signed after the trial court's order, depending on the resolution of this appeal.

We reverse and render judgment.

## Background

On March 31, 2006, Child Protective Services ("CPS") removed the child from the custody of Bhan and placed him in the foster care of Danet and Kranz. Although CPS chose not to seek termination of Bhan's parental rights, Danet and Kranz, on October 2, 2007, filed their petition in this suit affecting the parent-child relationship ("SAPCR"), seeking appointment as the child's joint managing

---

[1] *See* TEX. FAM. CODE ANN. § 153.005 (Vernon 2008).

conservators. In response, Bhan filed an amended answer and original counter-petition, seeking appointment as the child's sole managing conservator. On February 2, 2008, the parties entered into a "Rule 11 Agreement for Temporary Orders,"[2] requesting that Kranz and Danet serve as temporary managing conservators of the child and Bhan as the temporary possessory conservator of the child during the pendency of court proceedings. On May 9, 2009, the trial court entered agreed temporary orders to the same effect.

At trial, Kranz testified that he and Danet had taken care of the child for four years and four months. After CPS decided not to seek termination of Bhan's parental rights, he and Danet, in October 2007, decided to "get involved in the case" and file their SAPCR petition to be appointed as joint managing conservators. When they first received custody in April 2006, the child was seven months old and suffered from a "very severe diaper rash." Kranz thought that the child had been "starving," as if "he didn't know when his next meal was going to be." After Kranz and Danet received custody, Bhan "pretty much abandoned" the child by moving to Wisconsin and not visiting him for six months. She came down to visit the child "on average . . . two [weekends] a year" even though her visitation schedule allowed monthly visits. In addition, Bhan would occasionally

---

[2] *See* TEX. R. CIV. P. 11.

bring with her "different men" whom the child did not know, and she never brought "the same person twice."

Kranz explained that Bhan had initially thought that the child's father was Joseph Alaniz, who was her boyfriend at the time she lost custody of the child. However, a paternity test revealed the father to be George Hogeland, with whom Bhan lived for five months before she moved to Houston. About four months after losing custody of the child, Bhan was arrested for "disturbance of the peace" after fighting with Alaniz in a Family Dollar store parking lot. Shortly thereafter, Bhan, pregnant with her second child, who was Alaniz's son, moved to Wisconsin. After she had given birth to Alaniz's son, Alaniz "beat the crap out of her in the hospital." At the time of trial, Alaniz was incarcerated and scheduled to be released in October 2011.

Kranz noted that in late 2006, Bhan told him that if she were to take a drug test, "it would turn out dirty." Bhan was then ordered by CPS to take a drug test within 24 hours, but she did not comply. She had also informed Kranz that Alaniz had a drug problem.

Kranz further testified that in March 2008, Bhan came to Houston for a weekend visit with the child. After visiting on a Saturday, Bhan called on Sunday morning, explaining that she was not feeling well and would meet him and the child at the Houston Children's Museum at noon, an hour later than previously

4

scheduled. She did not arrive at the museum until 2:20 p.m., and she "very sneakily walk[ed] past the admission where you pay."

Kranz noted that in 2008, Bhan brought her younger son and a man, "Michael," on her visit to the child. Afterwards, Bhan failed to call the child for three weeks because they had "decided to go to New Orleans," where Michael let "some girl . . . borrow their truck." Bhan told Kranz that "the truck [had] disappeared, so [Bhan, her younger son, and Michael] had to take [a] bus back to Wisconsin," leaving Bhan without a telephone. In watching Bhan interact with her other son, Kranz noted that "there doesn't appear to be respect for her," and the child "screams at her" and "slaps" people.

Danet testified that during Bhan's visits, the child would "get[] very scared and [cry] at night," which he described as "very typical after pretty much every visit that he has when [Bhan] comes into town." Although Kranz and Danet encouraged Bhan to call the child and scheduled regular telephone calls, sometimes they "would come home for the phone call and then she wouldn't call at all." In the six months prior to trial, the child would complain that he did not want to talk with Bhan. However, Danet explained that if he and Kranz were to be appointed managing conservators, they would still encourage the child to remain in contact with Bhan.

5

Linda McDonald, a co-worker and family friend of Kranz and Danet, testified that in August 2008, she supervised one of Bhan's visits. When Bhan "wanted to make a special celebration" for the child's birthday, they visited her at a local hotel where Bhan was staying. Bhan brought her younger son and a "friend that was introduced as Dennis," who had "very little interaction" with the child. The amount of time that Bhan spent with the child was "very limited."

Rebecca Weiser, a co-worker and friend of Kranz, testified that in August 2009, she supervised a visit at the hotel in which Bhan was staying. She noted that while the child was in the hotel pool, he "went under three times," and Weiser had to "pull[] him up out of the water" each time. This caused her to be "concern[ed] for [the child's] safety." On cross-examination, Weiser admitted that she did not move to terminate the visitation or contact CPS after the incident and that Kranz was supervising the child as well.

Bhan testified that when she, with her mother, moved to Houston in December 2004, she was unaware that she was already pregnant with the child. Shortly after arriving in Houston, she met Alaniz and, despite his abusive tendencies, she later moved into a house with him in mid-2005. She noted that Alaniz would hide her driver's license, delete her telephone numbers, and attempt to control her. In December 2005, police officers were dispatched to their home to investigate alleged domestic violence, and, by March 2006, Bhan was "just waiting

6

for an opportunity to get out" and move away from Alaniz. She explained that she should have left the relationship sooner, but she was "really screwed up" at the time and "dismissed a lot of [Alaniz's] behavior" because she "thought it was important to have a family unit."

On the morning of March 31, 2006, Bhan planned to escape from Alaniz's abuse and take her child with her. The child had been diagnosed with "thrush," a yeast infection, which, Bhan explained, accounted for his diaper rash. To treat the thrush, she packed two antibiotics prescribed by the child's pediatrician. Because Alaniz had hidden her driver's license, Bhan had to "go through half the house" to find it and left the house "messy." She then took the child with her to a bus stop to take a bus to her mother's house in Wisconsin while Alaniz was away. However, Alaniz found Bhan at the bus stop, confronted her, and accused her of being a "drug user." He then "[took] off on a bicycle with" the child. Bhan called for emergency assistance, and a police officer drove her back to the house in a patrol car. Alaniz and the child were already at the house, and the police officer, after questioning Bhan and Alaniz, took the child away in his patrol car. Bhan explained that because the officer had taken the child away, she did not have time to feed him or apply his thrush medication. Bhan was quite upset and spent the weekend in a hotel room. She then attended a court hearing the following Monday, and the court ordered her to submit to a narcotics test, which came back

positive for cocaine. She submitted an affidavit in which she named Alaniz as the child's father, which she believed to be true at the time. The child was not returned to Bhan at the hearing.

After the hearing, Bhan moved back to Wisconsin to join her mother and notified CPS that she had moved. In June 2006, CPS informed her that it would seek "unrelated adoption" for the child. Bhan then returned to Houston for a second hearing, and CPS submitted to her a Family Service Plan ("FSP"). Bhan understood that she could regain custody of the child if she "not just completed [the FSP] but did . . . very well." Later, in the summer of 2006, Bhan stayed in Houston with Alaniz. She attended parenting courses, underwent a psychological evaluation, and stayed two nights at an "in-patient drug facility" pursuant to the FPS.

In September 2006, Bhan returned to Wisconsin, and Alaniz followed her. After the birth of her second child, Alaniz "beat [her] up" in the hospital room and was arrested. Bhan later bought Alaniz a bus ticket to return to Houston, while she remained in Wisconsin. There, she followed the FSP by taking parenting and relationship courses, attending drug and domestic violence counseling sessions, and undergoing follow-up psychological evaluations. At the time, she was working as a cashier at a dollar store and had a second job "doing clerical work."

8

She was living in "Section 8 housing" with her mother and second child and receiving food stamps.

Bhan admitted that she had previously been arrested in Massachusetts on a charge relating to heroin, and, in 1999, she was convicted in Wisconsin of the offenses of possession of marijuana and battery. She also admitted that, in 2006, she had used cocaine while pregnant with her younger son, causing her to fail the court-ordered narcotics test. Bhan further admitted that in July 2007, she was scheduled to fly to Houston for a visitation, but the airline would not allow her on the plane "due to [her] intoxication," so she boarded an early flight the next morning.

Bhan explained that if she was awarded custody of the child, she would take him back to Wisconsin and continue to live with her mother. She noted that her family could not come to Houston to visit the child because her mother had health problems and Kranz and Danet were not cooperative with them. Specifically, Bhan asserted that they were "alienating" and "isolating" her from the child. Kranz and Danet would not disclose the child's medical records to her, moved him to different schools without informing her, and "took him out of school" when Bhan planned to visit him in class. She further explained that the financial burden of traveling to Houston and the time that it took to raise her second son made it difficult for her to make regular trips to Houston.

9

**Standard of Review**

We will sustain a legal-sufficiency or "no-evidence" challenge if the record shows one of the following: (1) a complete absence of evidence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence conclusively establishes the opposite of the vital fact. *City of Keller v. Wilson*, 168 S.W.3d 802, 810 (Tex. 2005). In conducting a legal-sufficiency review, a court must consider evidence in the light most favorable to the verdict and indulge every reasonable inference that would support it. *Id.* at 822. The term "inference" means,

> In the law of evidence, a truth or proposition drawn from another which is supposed or admitted to be true. A process of reasoning by which a fact or proposition sought to be established is deduced as a logical consequence from other facts, or a state of facts, already proved. . . .

*Marshall Field Stores, Inc. v. Gardiner*, 859 S.W.2d 391, 400 (Tex. App.—Houston [1st Dist.] 1993, writ dism'd w.o.j.) (citing BLACK'S LAW DICTIONARY 700 (5th ed. 1979)). For a jury to infer a fact, "it must be able to deduce that fact as a logical consequence from other proven facts." *Id.*

Both direct and circumstantial evidence may be used to establish any material fact. *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). If there is more than a scintilla of evidence to support the challenged finding, we

must uphold it. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998). However, "'when the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence.'" *Ford Motor Co.*, 135 S.W.3d at 601 (quoting *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983)).

To raise a genuine issue of material fact, "the evidence must transcend mere suspicion." *Id.* Evidence that "is so slight as to make any inference a guess is in legal effect no evidence." *Id.* If the evidence allows only one inference, neither jurors nor the reviewing court may disregard it. *City of Keller*, 168 S.W.3d at 822. However, if the evidence at trial would enable reasonable and fair-minded people to differ in their conclusions, then the fact-finder must be allowed to do so. *Id.* A reviewing court cannot substitute its judgment for that of the fact-finder, so long as the evidence falls within this zone of reasonable disagreement. *Id.*

### Significant Impairment

In her first issue, Bhan argues that the evidence is legally and factually insufficient to support the jury's finding that her appointment as sole managing conservator would significantly impair the child's physical health or emotional development. She asserts that most of the evidence against her relates only to her "past conduct . . . which occurred approximately four or more years prior to trial

11

. . . [and] does not implicate [her] present parental fitness." Bhan further asserts that the evidence is "legally insufficient to overcome the parental presumption as a matter of law" and consists of "minor, insubstantial conduct" that only establishes that she is an "imperfect person."

Danet and Kranz argue that the evidence is legally and factually sufficient to support the jury's finding that they should be appointed as the child's sole managing conservators because removing the child from their home at the time of trial "would significantly impair his emotional development." In support of this argument, they assert that:

> [T]he jury heard evidence that [Bhan's] bad parenting would significantly impair [the child's] physical health or emotional development. Less than a year before trial, [the child] nearly drowned in a swimming pool while [Bhan] was supposed to be watching him. And [Bhan] repeatedly made extraordinarily bad decisions related to her visits with [the child], including being so drunk at the airport that she was not allowed to fly. The evidence, therefore, supports the jury's finding that awarding [Bhan] sole managing conservatorship would significantly impair [the child's] physical health or emotional development.

In any case involving an issue of conservatorship, the best interest of the child must always be the primary consideration of the trial court. TEX. FAM. CODE ANN. § 153.002 (Vernon 2008). And the court must presume that the best interest of the child is served by appointing a biological parent as sole managing conservator or both biological parents as joint managing conservators. *See*

12

*id.* § 153.131(a) (Vernon 2008); *see also In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000); *Mumma v. Aguirre*, 364 S.W.2d 220, 221 (Tex. 1963).

Nonparents seeking conservatorship carry a "heavy burden" of overcoming this presumption. *Lewelling v. Lewelling*, 796 S.W.2d 164, 167 (Tex. 1990). It is not adequate to offer evidence that a nonparent would be a better custodian of a child. *Id.* Instead, the parental presumption may only be rebutted with proof of certain findings prescribed by statute. *Id.*

A nonparent may rebut the presumption in favor of a biological parent only if evidence is produced showing that appointment of the biological parent as managing conservator would "significantly impair the child's physical health or emotional development." TEX. FAM. CODE ANN. § 153.131(a); *see In re R.T.K.*, 324 S.W.3d 896, 902–03 (Tex. App.—Houston [14th Dist.] 2010, pet. denied). Necessarily, the presumption may be overcome if "credible evidence is presented of a history or pattern of past or present child neglect, or physical or sexual abuse by that parent directed against the other parent, a spouse, or a child." TEX. FAM. CODE ANN. § 153.004(b) (Vernon 2008). In fact, the presentation of such "credible evidence" creates a rebuttable presumption that the appointment of the parent as sole managing conservator is not in the best interest of the child. *Id.* In disputes between a parent and a nonparent, the Texas Legislature has mandated that "close calls" should be decided in favor of the biological parent. *Lewelling*,

13

796 S.W.2d at 168. Here, the trial court instructed the jury, in pertinent part, as follows:

> The biological parent shall be appointed sole managing conservator, in preference to a non-parent, unless appointment of the biological parent would not be in the best interest of the child because the appointment would significantly impair the child's physical health or emotional development.
>
> "Significantly Impair" means the non-parent must affirmatively prove by a preponderance of the evidence *through specific actions or omissions of the parent that demonstrate that an award of custody to the parent would result in physical or emotional harm to the child.*

(Emphasis added.)

Bhan notes that much of the record evidence, including evidence of the child's "severe diaper rash" and the condition of her and Alaniz's home when police officers took the child in March 2006, her use of cocaine while she was unknowingly pregnant with her second child, her two misdemeanor convictions, and her intoxication at an airport in 2007, concerns conduct that occurred three or more years prior to trial. She asserts that this evidence does not implicate her "present parental fitness" or support the jury's finding that her conservatorship would significantly impair the child's physical health or emotional development.

In support of her assertion, Bhan relies on *In re S.W.H.*, 72 S.W.3d 772 (Tex. App.—Fort Worth 2002, no pet.). In *S.W.H.*, the court held that evidence that a mother had been twice incarcerated for testing positive for narcotics, in violation of her probation and more than four years prior to trial, was insufficient

14

to support a finding that the appointment of the mother as managing conservator of the child would significantly impair the child. *Id.* at 777–78. Noting that the mother had presented uncontroverted evidence that she had remained "clean" for three years prior to trial, the court explained that "evidence of past misconduct may not, by itself, be sufficient to show present parental unfitness." *Id.* at 778. Furthermore, the Thirteenth Court of Appeals has noted that if a parent "is presently a suitable person to have custody, the fact that there was a time in the past when the parent would not have been a proper person to have such custody is not controlling." *May v. May*, 829 S.W.2d 373, 377 (Tex. App.—Corpus Christi 1992, writ denied); *see also In re M.W.*, 959 S.W.2d 661, 666 (Tex. App.—Tyler 1997, writ denied) ("When determining fitness of a parent, the material time to consider is the present."). However, past misconduct may be considered due to the "permissible inference that an adult person's future conduct may well be measured by [their] recent deliberate past conduct as it may be related to the same or a similar situation." *May*, 829 S.W.2d at 377.

Here, Kranz and Danet's evidence concerning Bhan's more recent conduct in Houston does reveal that Bhan brought different men with her on her visits with the child, came from Wisconsin to visit the child only twice a year after losing custody of him, showed up late to a visit, tried to board an airplane in Wisconsin while she was intoxicated, "snuck" into the Houston Children's Museum, and,

after travelling to New Orleans following a visit with the child, did not call the child for three weeks. Weiser also testified that the child, during one of Bhan's visits at a hotel, "went under" the water in a pool three times and she had to pull him out of the water. This evidence, however, does not establish that Bhan's past misconduct is sufficiently linked to her fitness, at the time of trial, to be the child's custodian. Kranz and Danet did not present evidence that Bhan's past drug use, misdemeanor criminal history, or Alaniz's domestic violence, all of which occurred approximately four or more years prior to trial, constitute ongoing problems or part of a more recent pattern of behavior. Thus, the jury could not have reasonably inferred that Bhan's more remote conduct implicated her parental fitness, at the time of trial, such that the appointment of her as the sole managing conservator of the child would significantly impair the child's physical health or emotional development.[3] *See Lewelling*, 796 S.W.2d at 167.

---

[3]     Although not raised by Danet and Kranz, our colleague, in her dissent to the denial of en banc reconsideration, argues that Danet and Kranz rebutted the parental presumption by presenting "credible evidence" that Bhan had a history of "past or present child neglect." *See* TEX. FAM. CODE ANN. § 153.004(b) (Vernon 2008). However, the record before us contains no such evidence, and, more important, Danet and Kranz did not request that the trial court instruct the jury on the rebuttable presumption contained in section 153.004(b). The issue of "past or present child neglect" simply was not presented to the jury to consider. Thus, the controlling issue before us is whether the record contains evidence of any "specific actions or omissions" by Bhan that demonstrate that an award of custody to her would result in significant impairment to the child's physical health or emotional development.

16

Furthermore, Kranz and Danet's evidence of Bhan's more recent conduct does not itself constitute evidence that the appointment of Bhan as the sole managing conservator of the child would significantly impair the child's physical health or emotional development. Again, "[i]t is no longer adequate to offer evidence that the nonparent would be a better custodian of the child." *Id.*

In regard to the impairment of the child's physical health, Kranz and Danet assert that the child "nearly drowned" during one of Bhan's visits. Although Weiser testified that he "went under" water three times at a hotel swimming pool during a visit, there is no evidence that the child "nearly drowned." Indeed, the child was accompanied by three adults: Bhan, Weiser, and Kranz. And Bhan had to watch her younger son as well during the visit. Kranz and Danet also cite the child's "diaper rash" when CPS initially removed him from Bhan's home in March 2006. However, Bhan's uncontroverted testimony and supporting medical records established that she had taken the child to a doctor, who diagnosed the child with thrush and prescribed medication. Bhan further testified that she had called the doctor a second time regarding the rash in late March 2006, and the doctor told her to continue treatment. Given the undisputed facts, we hold that the jury could not have reasonably concluded that these incidents constitute evidence that awarding custody of the child to Bhan would significantly impair the child's physical health.

In regard to impairment of the child's emotional development, the jury could have reasonably inferred that Kranz and Danet would be better custodians of the child based on Bhan's criminal record and her actions in sneaking into the Houston Children's Museum, bringing different men to her visits with the child, and, after a visit with the child, taking a spontaneous trip to New Orleans and not calling the child. However, there is no evidence that Bhan's conduct, albeit clearly inappropriate, constitutes "specific actions or omissions" that demonstrate that awarding her conservatorship would significantly impair the child's emotional development. *See* TEX. FAM. CODE ANN. § 151.131(a). Kranz and Danet provided no evidence explaining how any of the above conduct would contribute to significant impairment of the child's emotional development were he to be placed in Bhan's custody. *See Lewelling*, 796 S.W.2d at 166 & n.3 (noting strength of parental presumption and suggesting that "[w]ith regard to impairment of emotional development, it would seem that very strong psychological or psychiatric testimony would have to be offered") (quoting Wicoff, *Joint Managing Conservatorship* P-22, State Bar of Texas Advanced Family Law Course (1987)). And, as stated above, Bhan's criminal convictions, which all occurred four or more years prior to trial, could not reasonably support a conclusion that her parental fitness at the time of trial would have resulted in significant impairment to the child's emotional development. Given the strength of the parental presumption,

18

we hold that the jury could not have reasonably concluded that awarding custody of the child to Bhan would result in significant impairment to the child's emotional development.

In *Lewelling*, the trial court appointed a child's paternal grandparents as the managing conservators of the child because it found that naming the mother as the managing conservator would significantly impair the child's physical health and emotional development. 796 S.W.2d at 165. The court of appeals affirmed, citing the mother's continuing relationship with her physically abusive ex-husband, failure to visit the child for "approximately two months" after her ex-husband took the child, unemployment, residence in "a small house with her mother and other family members," and admission to a psychiatric hospital on two occasions. *Id.* at 165–66. However, the supreme court concluded that the mother's unemployment and living conditions did not constitute evidence of significant impairment. *Id* at 167. And her admissions to the psychiatric hospital did not constitute evidence of significant impairment in light of her uncontradicted testimony that she was discharged both times "because she had no mental problems." *Id*. The supreme court also noted that her actions in returning to her abuser could be explained as "symptoms of what has been termed 'the battered women syndrome,'" and it noted that a "parent should not be denied custody of a child based on the fact that he or she has been battered." *Id.* at 167 & n.6.

19

Likewise, here, many of the concerns regarding Bhan's past drug use and criminal convictions similarly do not support a conclusion that the child would suffer significant impairment to his physical health or emotional development. Bhan underwent drug counseling for one and one-half of a year prior to trial. And, although Bhan may have engaged in some poor parenting practices in the past, there was uncontradicted testimony that she had completed several courses involving "effective parenting" and "infant/toddler care" and planned to attend family counseling with the child during the transition into her custody. And, as in *Lewelling,* Bhan's actions in maintaining some contact for a short time with Alaniz in November 2006, also more than four years before trial, and then moving to Wisconsin in an effort to escape Alaniz, can be explained as a response to spousal abuse. *See id.*

Although our dissenting colleague characterizes Bhan as, among other things, "drug-addicted," "promiscu[ous]," and "indigen[t]," Danet and Kranz in their briefing to this Court do not so label her. Indeed, CPS decided not to seek termination of Bhan's parental rights. In October 2007, Danet and Kranz filed their SAPCR petition to be appointed joint managing conservators of Bhan's biological child. It is true that Danet and Kranz in their SAPCR against Bhan had a lower burden of proof, i.e., "a preponderance of the evidence," than CPS would have had against Bhan to terminate her parental rights, i.e., "clear and convincing

20

evidence." However, the bottom line is that Danet and Kranz had the burden to overcome the presumption in favor of Bhan by presenting evidence of "specific actions or omissions" of Bhan "that demonstrate that an award of custody to [her] would result in physical or emotional harm to the child."[4] A review of the record in the light most favorable to Danet and Kranz reveals that they presented no evidence of any such "specific actions or omissions." Again, evidence that a nonparent would be a better custodian of a child is not enough to carry the "heavy burden" of overcoming the presumption that it is in the best interest of the child that his biological parent be appointed as sole managing conservator. *Id.* at 167.

Finally, Kranz and Danet argue that, even without reference to Bhan's conduct, "removing [the child] from the only home he has ever known" would "significantly impair his emotional development." This court has recently held that a trial court could have reasonably concluded that removing a child from "the only person who has consistently cared" for the child would "significantly impair" the child's development. *McPherson v. Hollyer*, No. 01-09-00619-CV, 2011 WL 1632163, at *6 (Tex. App.—Houston [1st Dist.] Apr. 28, 2011, no pet.) (mem. op.) (quoting *In re K.R.P.*, 80 S.W.3d 669, 674 (Tex. App.—Houston [1st Dist.] 2002, pet. denied)).

---

[4] Again, we note that Danet and Kranz did not request that the trial court instruct the jury on the rebuttable presumption contained in Family Code section 153.004(b), and, thus, the issue of "past or present child neglect" was not presented to the jury for its consideration.

Here, as noted above, the trial court's charge to the jury included an instruction stating that "significantly impair" means "the non-parent must affirmatively prove by the preponderance of the evidence *through specific actions or omissions of the parent* that demonstrate that an award of custody to the parent would result in physical or emotional harm to child." (emphasis added.) Bhan notes that the charge explicitly required Kranz and Danet to prove "specific acts or omissions" on her part to override the parental presumption in her favor and, regardless of our holding in *McPherson*, "it is the court's charge . . . that measures the sufficiency of the evidence when the opposing party fails to object." *See Osterburg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000).

"When neither party objects to a jury instruction, an appellate court must review the sufficiency of the evidence in light of the instruction actually given, even if the statement of the law in the charge is not correct, and even if the charge as given effectively increases the burden of proof on a party beyond that actually required by the correct law or results in a 'more rigorous' standard of proof." *Reliant Energy Servs., Inc. v. Cotton Valley Compression, L.L.C.*, 336 S.W.3d 764, 782 (Tex. App.—Houston [1st Dist.] 2011, no pet.) (citing *Romero v. KPH Consol., Inc.*, 166 S.W.3d 212, 220–21 (Tex. 2005); *Wal-Mart Stores, Inc. v. Sturges*, 52 S.W.3d 711, 715 (Tex. 2001); *City of Fort Worth v. Zimlich*, 29

S.W.3d 62, 71 (Tex. 2000); *IP Petroleum Co., Inc. v. Wevanco Energy, L.L.C.*, 116 S.W.3d 888, 897, n.8 (Tex. App.—Houston [1st Dist.] 2003, pet. denied)).

Here, the trial court's charge to the jury explicitly required that Kranz and Danet prove, by a preponderance of the evidence, that "specific actions or omissions" of Bhan demonstrated that her custody of the child would result in physical or emotional harm to the child. Thus, the jury could not rely solely on Kranz and Danet's evidence that removing the child from their custody would be difficult and traumatic for the child. In sum, Kranz and Danet did not present any evidence of Bhan's specific acts or omissions from which a fact-finder could reasonably infer that the appointment of Bhan, the child's biological parent, as sole managing conservator of the child would significantly impair the child's physical health or emotional development.

To the extent that Kranz and Danet argue that any harmful effect of removing the child from their custody would be precipitated by an act or omission of Bhan, whether by her moving to Wisconsin or visiting the child only twice a year, on average, since losing custody, Bhan notes that she moved to Wisconsin to escape from Alaniz and live with her mother. She also notes that she did not have the economic means to make more frequent visits to Houston to visit the child. Furthermore, "the fact that [the child] has lived with [Kranz and Danet] for such a lengthy period is largely attributable to delays" in the judicial proceedings. *See*

23

*Lewelling*, 796 S.W.2d at 168 n.9 (noting parent was not at fault for "lengthy appeals process," so length of time child spent with non-parents was largely "judicially created"). Using such a fact to deny a parent conservatorship of her child would "thwart[] the legislatively-mandated parental preference." *Id.*

Accordingly, we hold that the evidence is legally insufficient to support the jury's finding that Kranz and Danet, as non-parents, should be appointed the child's managing conservators. *See City of Keller*, 168 S.W.3d 802 at 810.

We sustain Bhan's first issue.

Having sustained Bhan's first issue and held that the evidence is legally insufficient to support the jury's findings, we need not address whether the evidence is factually insufficient to support the jury's finding that Kranz and Danet, as non-parents, should be named the child's managing conservators, or address her second issue, in which she contends that the trial court erred in not allowing her to present testimony from out-of-state witnesses via telephone.

## Conclusion

We reverse the order of the trial court and render an order appointing Bhan as sole managing conservator of the child.  We also modify the order pursuant to the parties' partial-settlement agreement and appoint Kranz and Danet as possessory conservators.[5]

Terry Jennings
Justice

Panel consists of Justices Jennings, Sharp, and Brown.

En banc reconsideration was requested.  TEX. R. APP. P. 41.2(c).

Chief Justice Radack and Justices Jennings, Keyes, Higley, Sharp, Massengale, Brown, and Huddle participated in the vote to determine en banc reconsideration. Justice Bland, not sitting.

A majority of the Court voted to deny en banc reconsideration.  *See* TEX. R. APP. P. 49.7.

Justice Keyes, dissenting from the denial of en banc reconsideration.

---

[5]  In her third issue, Bhan asks, as do Kranz and Danet, that this court enforce the agreement that "[i]n the event that the Court of Appeals reverses the judgment of the Trial Court and renders judgment appointing Jessica Bhan as the sole managing conservator . . . Bhan agrees that [Kranz and Danet] shall be appointed as possessory conservators at the conclusion of this appeal.  In this event, the Parties agree to jointly request the Court of Appeals to implement this Agreement by rendering judgment appointing [Kranz and Danet] as possessory conservators." *See* TEX. R. CIV. P. 11.  Because we reverse the judgment of the trial court and render judgment in favor of Bhan, we render an order appointing Kranz and Danet as possessory conservators pursuant to the terms of the parties' agreement. *See* TEX. R. APP. P. 42.1(a)(2)(A) (permitting appellate court to render judgment effectuating agreement of parties).