Harry Henry LOUIS, III, Appellant,

v.

The STATE of Texas, Appellee.

No. 09–03–236–CR.

Court of Appeals of Texas, Beaumont.

Submitted Nov. 10, 2004.

Decided March 2, 2005.

---

Kevin Sekaly Cribbs, Beaumont, for appellant.

Tom Maness, Criminal Dist. Atty., Philip Babin, Asst. Criminal Dist. Atty., Beaumont, for state.

Before McKEITHEN, C.J., BURGESS and GAULTNEY, JJ.

## OPINION

STEVE McKEITHEN, Chief Justice.

Harry Henry Louis, III appeals his conviction by a jury for the offense of Aggra-

vated Robbery, alleged to have occurred on or about October 10, 2002. Appellant pleaded true to two prior felony convictions included in the indictment for enhancement purposes and the jury assessed punishment at confinement in the Texas Department of Criminal Justice–Correctional Institutions Division for a term of fourteen years. He raises four issues in his direct appeal to this Court:

1. The evidence was not sufficient for the jury to identify the Appellant as the actor in the offense.

2. The evidence was not sufficient for the jury to determine that a deadly weapon was used in the offense.

3. The evidence was not sufficient for the jury to determine that the complainant had been threatened by Appellant or placed in fear of imminent bodily injury or death.

4. The evidence was not sufficient for the jury to determine that the defendant was a party.

For each of the four issues, appellant argues the absence of both legally and factually sufficient evidence to sustain the verdict. The State acknowledges that none of the witnesses who testified at the trial could identify appellant as being involved in the robbery. Therefore, what evidence there is in the record tying appellant to the robbery is purely circumstantial.

## LEGAL SUFFICIENCY REVIEW

■ The Fourteenth Amendment's guarantee of due process of law prohibits a criminal defendant from being convicted of an offense and denied his liberty except upon proof sufficient to persuade a rational trier of fact of guilt beyond a reasonable doubt. *In re Winship*, 397 U.S. 358, 362, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); *Gollihar v. State*, 46 S.W.3d 243, 245–46 (Tex. Crim.App.2001). In assessing the legal sufficiency of the evidence to support a conviction, we consider all the record evidence in the light most favorable to the jury's verdict and determine whether, based on that evidence and reasonable inferences therefrom, a rational jury could have found the accused guilty of all the elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *Moff v. State*, 131 S.W.3d 485, 488 (Tex.Crim.App.2004).

## FACTUAL SUFFICIENCY REVIEW

In *Clewis v. State*, 922 S.W.2d 126 (Tex. Crim.App.1996), the Court of Criminal Appeals vested the Texas courts of appeals with the authority to review fact questions in criminal cases. Since Clewis, the appellate standard for reviewing fact questions has been refined several times. See *Johnson v. State*, 23 S.W.3d 1 (Tex.Crim.App. 2000), followed a year later by *Goodman v. State*, 66 S.W.3d 283 (Tex.Crim.App.2001), which was further clarified by *Zuliani v. State*, 97 S.W.3d 589 (Tex.Crim.App.2003). The latest revision of the appellate standard for reviewing factual sufficiency issues is set out in *Zuniga v. State*, 144 S.W.3d 477 (Tex.Crim.App.2004).

In Zuniga, the Court attempted to "resolve some of the confusion created by the standard that has developed since Clewis[.]" *Zuniga*, 144 S.W.3d at 484. While the Zuniga Court did not intend to alter the standards of review which have evolved since Clewis, it recognized, and apparently corrected, a significant deficiency in the various forms the standard took from Clewis through Zuliani. Id. at 484–85. The Court presented, with explanation, the current standard for reviewing factual sufficiency issues as follows:

There is only one question to be answered in a factual-sufficiency review: Considering all of the evidence in a neutral light, was a jury rationally justified

in finding guilt beyond a reasonable doubt? However, there are two ways in which the evidence may be insufficient. First, when considered by itself, evidence supporting the verdict may be too weak to support the finding of guilt beyond a reasonable doubt. Second, there may be both evidence supporting the verdict and the evidence contrary to the verdict. Weighing all the evidence under this balancing scale, the contrary evidence may be strong enough that the beyond-a-reasonable-doubt standard could not have been met, so the guilty verdict should not stand. This standard acknowledges that evidence of guilt can "preponderate" in favor of conviction but still be insufficient to prove the elements of the crime beyond a reasonable doubt. Stated another way, evidence supporting guilt can "outweigh" the contrary proof and still be factually insufficient under a beyond-a-reasonable-doubt standard.

Id. (footnote omitted).

## TRIAL EVIDENCE

Because proof of appellant's identity as one of the perpetrators of the robbery was purely circumstantial, a somewhat detailed rendition of the evidence presented to the jury is in order. Essentially, the offense consisted of two masked individuals dressed in blue jumpsuits, and carrying what appeared to be firearms, robbing the manager of the Domino's Pizza establishment around closing time on October 10, 2002. The State's witnesses consisted of eight persons, four employees of Domino's Pizza and four officers from the City of Port Arthur Police Department. Two witnesses were called by appellant in his defense, but appellant did not testify. From a close examination of the record, there appears to be no dispute among the Domino-employee witnesses as to the details of the robbery. In addition to an undetermined amount of cash, a number of checks

were also stolen. The robbers fled the area on foot, running in a south to southeasterly direction. We now identify each of the witnesses and describe their testimony, especially any testimony bearing on the identity of the perpetrators apart from the general description noted above.

The State's first witness was David Hoffpauir, the manager of the Domino's store, and the victim alleged in the indictment. Hoffpauir testified that on the evening in question he was in the store's office when he heard noises coming from the front of the store. As he headed to the front to investigate, Hoffpauir encountered a person wearing a mask, carrying "a gun," and wearing a blue jumpsuit. The masked gunman directed Hoffpauir to return to the office and Hoffpauir complied as he feared for his safety. As there was no money in the office, the masked gunman directed Hoffpauir to walk to the front of the store. As Hoffpauir neared the front of the store, he encountered a second individual who was also armed, wearing a mask and dressed in a jumpsuit. Hoffpauir proceeded to the front counter where the money-drawer was located and opened the drawer for the robbers. At that point, Hoffpauir was directed by one of the gunmen to get on the floor. Within a matter of seconds, the gunmen took money from the drawer and left the store. Hoffpauir did not see in what direction the men ran. After the gunmen were gone, Hoffpauir locked the doors to the store and telephoned "911." While Hoffpauir was on the telephone, an off-duty police officer, later identified as Kevin Schexnider, arrived at the scene. Hoffpauir was unable to identify appellant as one of the robbers.

The State's second witness, seventeen-year-old Timesia Drake, was also employed by Domino's Pizza on the night of the robbery, and was also present when

the two gunmen entered the store. She recalled that the two men entered the store and immediately instructed her and the other employees present to empty their pockets and to "get on the floor." As she lay on the floor, Timesia observed the gunmen bring David Hoffpauir into the front of the store where he opened the cash-drawer. The gunmen proceeded to take the money and run out the back door of the store. Timesia estimated that the entire robbery took about "two or three minutes." Timesia also could not discern any of the gunmen's facial features through the masks, so she could not identify appellant as one of the robbers.

The next witness was Officer Kevin Schexnider of the Port Arthur Police Department. At approximately 11:25 p.m. on the night in question, Officer Schexnider was off-duty and in his personal vehicle talking on his cellular phone with another Port Arthur Police officer who was on-duty. As Officer Schexnider waited for the traffic signal at the intersection of 25th Street and Memorial Boulevard to change, he heard over the police radio of the robbery at the Domino's store. As the store was very close to his location he proceeded there, parked his car, and approached the front door. Someone inside the Domino's store recognized Schexnider and motioned for him to enter the store. However, the front door was locked so Schexnider ran around the building, and, as he rounded the corner, a truck driver alerted Schexnider that someone had run past heading in a southerly direction. At that point, Schexnider stated: "I looked and I seen (sic) a male black run and make the corner past some bushes around the house." When the State asked if he could describe how the man running was dressed, Schexnider replied, "It was too quick. I didn't get a good description of him." Schexnider then testified that he gave pursuit, running to the spot where he last saw the man run. At this point, we reproduce verbatim the testimony from Officer Schexnider as it describes the subsequent events surrounding the appearance, discovery, and arrest of appellant from Schexnider's perspective:

Q. [State] Let me back up. You say you gave pursuit. I guess you ran to the spot where you saw him run?

A. [Schexnider] Yes.

Q. Couldn't find him there.

A. No. Once I ran to where I lost sight of him at, I looked around, and couldn't find him. So, I just continued in a, I think, southeasterly direction running that way. And I got on my cell phone and called dispatch and let them know which way the suspect was heading, and by that time other officers were in the area and started spotting him running to different locations.

Q. What did you do after that?

A. While I was speaking with dispatch on my cell phone, one of my supervisors come by, picked me up and I got in the car with him and we made a few blocks trying to locate the suspects. I think some other officers got on the radio and said they seen (sic) him on 24th Street. We went a block south and set up a perimeter there and got out on foot.

Q. What happened then?

A. I hooked up with another officer. Being that I didn't have my walkie, I was trying to stay with a on duty officer; and we went and walked several alleyways checking under the houses and alleyways in an attempt to locate the suspects.

Q. Did you find them?

A. No.

Q. Were they eventually found?

A. Yes.

Q. Where were they located at?

A. In a backyard in the 2400 block of Fifth Avenue, I believe.

Q. Now, did you go to that spot where they found them?

A. Yes, I did. I was just right across the alleyway. I had to jump a fence to get to where they were at.

Q. How long was it—by the time you got there—back up. From the time they found them until the time you got there, how long roughly was that?

A. Approximately 30 seconds.

Q. So, you get there. Did they have two people in custody?

A. Yes.

Q. From the spot where they had the two people in custody back to where Domino's is at, how far is that?

A. It's about six blocks, five or six.

Q. You said earlier you set up a perimeter. Did other officers set up a perimeter?

A. Yes, sir, once the other officers got in the area, receiving information from other officers, we set up a perimeter between 23rd and 24th Street on Fifth—Fourth and Fifth Avenue.

Q. When you say set up a perimeter, you-all try to—

A. Box them in, seal it off.

Q. The people that they had in custody, was one of those one of the ones you saw running; or could you tell?

A. I really couldn't make a positive identification. It was a split second. I couldn't—I don't even think I could give out a good clothing description. It was that fast.

Q. After they had them in custody, you went over there to where they were at.

A. Yes, sir.

Sergeant Rodney Harrison of the Port Arthur Police Department was the State's next witness. Harrison was on-duty when he received the report of the Domino's robbery, at approximately 11:25 p.m. Harrison went to the neighborhood situated in the direction the suspects were last seen running. The directional information was provided to Harrison by Officer Schexnider. When he arrived in the neighborhood, Harrison set up a perimeter, along with other officers. Once the perimeter was established, Harrison stated he spotted two men run in an alleyway across his perimeter set-up. Harrison immediately began foot pursuit, but as he arrived at the alleyway, the men had disappeared from sight. As Harrison was aware that another officer was positioned at the other end of the alleyway, Harrison suspected that the men had to be somewhere close. Harrison then advised the officers making up the perimeter to "close in" because Harrison knew the men had to be within that city block, and a yard-to-yard search ensued. The two men Harrison had spotted earlier were found shortly thereafter. Harrison's direct examination testimony continued as follows:

Q.[State] Did you look at the two men they found?

A.[Harrison] Yes.

Q. Were they the same two men that were running from you when you first saw two men run?

A. Yes, they were.

Q. Still dressed the same way?

A. Still dressed the same way.

Q. Do you remember what they were dressed in?

A. One gentleman was wearing all white clothing. The other gentleman had on black pants and a white shirt.

Q. When they crossed your perimeter, is that how they were dressed?

A. That's correct.

Q. I gather some of the other officers were involved in making this perimeter; is that right?

A. Yes, sir.

Q. One of the individuals that was stopped that night and that you saw crossing your path, do you see him in the courtroom today?

A. Yes, sir, he's seated at the table next to [Trial Counsel].

[State]: Your Honor, I'd ask the record to reflect he's identified the defendant.

THE COURT: The record will so reflect.

On cross-examination, Sergeant Harrison drew a diagram for the jury of the neighborhood area indicating where he was located and where appellant was seen by Harrison crossing into the perimeter. Trial counsel concluded his cross-examination of Harrison with the following query:

Q. Now, I remember when I was prosecuting we heard this all the time. I assume it's still true. It's not uncommon for black guys to run from the Port Arthur Police for a variety of reasons.

A. All kind of reasons, yes.

Later, on re-direct examination, the State inquired of Harrison if efforts were made to locate any of the clothing, masks, firearms, or any other items used in the robbery, to which Harrison responded that there were efforts made, and in his experience, "there are times that we do not locate evidence. You know, when people are running through neighborhoods, things are discarded; and we never find them." Harrison also agreed that, in his experience as a robbery/homicide detective, it is fairly common for people to try and lose some of the evidence that they use to commit the robbery. Continuing with the hypothetical questions on re-direct, the following is reflected in the record:

Q.[State] And even over short distances, it is possible that they could get rid of or hide from the police things used to help commit a robbery and the police just cannot find it?

A.[Harrison] That's correct.

Q. In your experience as a robbery/homicide detective, have you experienced in the past where people would commit a robbery, try to lose things that they used to commit the robbery like guns or clothing but hang on to the loot?

A. That's correct, it's common practice. They will usually—in my past experience, I've seen them discard their disguises, the handguns used in the offense or whatever their weapon was; but they would always hang on to the proceeds of the crime.

Trial counsel's re-cross-examination of Sergeant Harrison concluded with the following:

Q.[Trial Counsel] And it could just as well be that you didn't find this stuff, the guns and the masks, because the people that did the robbery actually got through your perimeter maybe even before you set it up or something. They just got away.

A.[Harrison] It's possible.

The State's next witness was also one of the officers who became part of the perimeter that was established following the robbery. Officer Herbert Otis shined his spotlight through the 22nd Street alleyway and saw other officers chasing some individuals. Officer Otis observed one individual wearing white pants, but did not see the other individual. He saw the man in the white pants run between a house heading in a westerly direction. At that point, Otis lost sight of the person, so he got out of his patrol car and began to run in the direction where the man had run, towards Fourth Avenue. Otis began to visually check around the residences on Fourth

Avenue, and as he looked between two houses, Otis observed two males, one wearing white pants and one wearing black pants, "kneeling in the sticker bush on the ground." Otis held the men at gunpoint until the other officers arrived to take the men into custody. Otis identified appellant as one of the men kneeling on the ground, the other man Otis named as "John Rice." After the appellant and the other man were removed from the "sticker bush" area, Otis observed several $20 bills on the ground "just right underneath where they were. It appeared they may have been, like, almost sitting on them." As Otis searched the "sticker bush" area, he discovered a dark-colored wallet "deep inside the sticker bush." This wallet was later identified by another State's witness, Dwayne Rachal, an employee of Domino's Pizza who was also robbed by the masked gunmen on the night in question, as belonging to him. Pertinent testimony by Rachal will be set out below.

Officer Heather Primm was the following witness for the State. Officer Primm was involved in retrieving the wallet, cash, and some checks located in the "sticker bush" area. Copies of the checks were tendered into evidence and identified as being made payable to "Domino's." Primm agreed that the checks were found "inside the sticker bush." On cross-examination, Primm specified that "located inside" the sticker bush itself was "money, checks and a wallet."

The State's final two witnesses, Dwayne Rachal and Herman Washington, were both employees of Domino's Pizza and were inside the premises on the night of the robbery. Their testimony essentially tracked that of the other Domino's employees. As with the other store employees, Rachal did not see the faces of the gunmen and could not give positive identification, but did notice that the gunman who took his wallet was wearing dark-colored gloves. Washington added that he noticed one of the gunmen was wearing black boots. During the robbery, one of the gunmen took the money and checks that Washington was in the process of tallying, and Washington was able to identify State's Exhibit 8 as a copy of one of the checks he had initialed that night. While the State did not ask Washington to try to identify appellant as one of the gunmen, on cross-examination, Washington agreed that he could not say appellant was one of the robbers on the night in question. At this point in the trial, the State rested its case-in-chief.

Appellant called two of the State's witnesses back to testify for the defense. Officer Herbert Otis stated the money appearing in the photograph, State's Number 6, was not the money he observed at the scene where appellant was located. Otis described the money he saw as appearing "kind of like balled up and just dropped[,]" as opposed to the money appearing in State's Number 6 which, to Otis, appeared "like it's folded in half."[1] Also, Otis admitted that, although two men were found kneeling in front of the "sticker bush," Otis never observed a second man running, only the man in the white pants. Otis further confirmed that when he ap-

---

1. State's Exhibit 6 is a photograph introduced during the testimony of Officer Primm. Primm described the photograph as depicting "money located by the house." Primm confirmed that there was money located in two different places. The record does not contain any testimony, either by exact number or approximation, indicating the total amount of cash taken by the robbers from the Domino's cash drawer, from Dwayne Rachal, and from Herman Washington's delivery receipts. Therefore, whether Officer Otis' lack of familiarity with the money depicted in State's Exhibit 6 favors the State or the appellant is not immediately apparent.

proached appellant and John Rice, Otis never saw any jumpsuits, masks, gloves, or guns.

Appellant's final witness, Officer Heather Primm, testified she was involved in the subsequent search for the various items of apparel and the weapons believed to have been discarded by appellant and John Rice. With the help of a police dog and the dog's handler, Primm attempted to locate any of the presumably discarded apparel or firearms belonging to the robbers. Nothing was recovered. At this point, the defense rested its case, and the State had no rebuttal witnesses.

■ Initially, we must overrule issues two and three as David Hoffpauir testified that he was concerned for his safety because the masked man he first encountered threatened Hoffpauir with what appeared to be a "real gun." Appellant appears to contend that because Hoffpauir later uttered the words, "I'm not afraid of the guys;..," proof of the element that the victim was placed in fear of imminent bodily injury or death was insufficient. The record reflects the full context of the questioning as follows:

Q.[State] I guess this is a silly question: You're afraid of these guys, right?

A.[Hoffpauir] I'm not afraid of the guys; but, you know, they do have guns and stuff. So ...

Q. Yeah, I guess that's what I'm asking. You're afraid of their guns.

A. Yeah.

■ Appellant also contends the evidence is insufficient to show a deadly weapon or firearm was used during the commission of the offense because the testimony described what the men carried as "guns," and the witnesses were "untrained individuals." On cross-examination, however, Herman Washington testified that he had seen a gun before as his mother had owned a small, .22 caliber "handgun," "a revolver." Washington also testified that the handgun pointed at him by one of the gunmen during the robbery was an automatic, "either a 45 or a 9–millimeter." There is no record evidence contradicting this testimony. We find both legally and factually sufficient evidence exists that the victim was placed in fear of death or serious bodily injury by the gunmen, and that both gunmen were in possession of a "firearm," which is, by definition, a deadly weapon. Tex. Pen.Code Ann. § 1.07(17)(A) (Vernon Supp.2005). See *Ex parte Carrasco*, 750 S.W.2d 222, 225 (Tex. Crim.App.1988). Issues two and three are overruled.

■ Issue four complains of the lack of sufficient evidence to find appellant guilty as a party to the aggravated robbery. This issue is essentially subsumed in our resolution of issue one because the testimony from the complainant and the store-employees indicated that both gunmen were clearly acting together in committing the robbery. Here, the State presented both legally and factually sufficient evidence to show conduct by one of the gunmen constituted the offense charged, i.e., the aggravated robbery of Hoffpauir, and that the other gunman acted with the intent to promote or assist the robbery of Hoffpauir. The jury was instructed that it was authorized to convict appellant of the aggravated robbery "either acting alone or as a party, as that term has been defined[.]" After being so charged, the jury returned a general verdict finding appellant guilty of aggravated robbery. The principle is well-established that when the jury returns a general verdict and the evidence is sufficient to support a guilty finding under any of the allegations submitted, the verdict will be upheld. See *Swearingen v. State*, 101 S.W.3d 89, 95 (Tex.Crim.App.2003); *Rabbani v. State*,

847 S.W.2d 555, 558 (Tex.Crim.App.1992). Additionally, assuming appellant was not the primary actor in the robbery, the primary actor does not necessarily need to be identified to convict a defendant as a party. See *Perry v. State*, 977 S.W.2d 847, 849–50 (Tex.App.-Houston [14th Dist.] 1998, no pet.). Therefore, the lone remaining question for review is whether the record contains legally and factually sufficient evidence identifying appellant as one of the gunmen so as to sustain the conviction.

### LEGAL SUFFICIENCY ANALYSIS

■ When reviewing a case comprised wholly of circumstantial evidence, the standard of review is the same as it is for reviewing cases in which direct evidence exists. See *Kutzner v. State*, 994 S.W.2d 180, 184 (Tex.Crim.App.1999). Circumstantial evidence, by itself, may be enough to support the jury's verdict. Id. "Circumstantial evidence" is direct proof of secondary facts which, by logical inference, demonstrates the ultimate fact to be proven. See *Cowan v. State*, 840 S.W.2d 435, 438 n. 10 (Tex.Crim.App.1992) (quoting *Taylor v. State*, 684 S.W.2d 682, 684 (Tex. Crim.App.1984)). In the law of evidence, an inference is a fact or proposition drawn from an admitted or otherwise proven fact. See *Marshall Field Stores, Inc. v. Gardiner*, 859 S.W.2d 391, 400 (Tex.App.-Houston [1st Dist.] 1993, writ dism'd w.o.j.) (op. on reh'g). It is a logical consequence flowing from a proven fact. Id. If circumstantial evidence provides no more than a suspicion, the jury is not entitled to reach a speculative conclusion. Id. at 401. However, the prosecution need not exclude every other reasonable hypothesis except the guilt of the accused. *Sonnier v. State*, 913 S.W.2d 511, 516 (Tex.Crim.App.1995).[2]

Here the State acknowledges the fact that the basis for identifying appellant as one of the robbers is appellant's close proximity to property identified as having been taken during the robbery. The State suggests that sufficiency of the evidence in this case will turn on the long-standing common law rule involving "unexplained possession of recently stolen property." See *Hynson v. State*, 656 S.W.2d 460, 461 (Tex.Crim.App.1983).

We find the discussion in *Rogers v. State*, 929 S.W.2d 103, 108 n. 2 (Tex.App.-Beaumont 1996, no pet.) helpful even though Rogers was a burglary case. The question in Rogers was whether or not there was sufficient evidence to prove the defendant was the perpetrator of the offense charged. Id. at 104. In Rogers, we observed:

Case law has established when there is independent evidence of a burglary, the unexplained personal possession of recently stolen property will support an inference of guilt of the offense in which the property was stolen. *Hardesty v. State*, 656 S.W.2d 73, 76 (Tex.Crim.App. 1983). Hardesty overruled a long line of prior holdings by the Court of Criminal Appeals which stood for the proposition that evidence of a defendant's recent and unexplained possession of stolen property was sufficient, (in itself), to sustain a conviction. Id. at 77. The Hardesty Court instead held that said unexplained possession was merely a circumstance of guilt and, as such, was

**2.** Citing two pre-Clewis cases, appellant appears to suggest the State still bears the burden of excluding every other reasonable hypothesis except that of the guilt of the defendant. We note, however, the "reasonable hypothesis analytical construct" was overruled over a decade ago. See *Geesa v. State*, 820 S.W.2d 154 (Tex.Crim.App.1991), overruled on other grounds by *Paulson v. State*, 28 S.W.3d 570, 573 (Tex.Crim.App. 2000).

not conclusive. Id. As the Court observed: "[o]nce the permissible inference arises, sufficiency of the evidence must still be examined according to applicable evidentiary standards of appellate review since the inference is not conclusive." Id.

Id. at 108 (emphasis added; parenthetical emphasis in original) (footnote omitted). Hardesty seems clear on the issue: "Proper use of legal terminology requires that the deduction drawn from a defendant's recent and unexplained possession of stolen property be termed a permissible inference. Although many cases use the term 'presumption,' we now clarify the law and disavow any previous language to the contrary in discussing theft cases under V.T.C.A., Penal Code, § 31.03(b)(1)." *Hardesty*, 656 S.W.2d at 77.

■■■■ As the State points out in its brief, in order to rely on Hardesty's "permissible inference," the actor must have been in "personal possession" of the stolen property at some point. We note that under certain circumstances, actions of a defendant may show a conscious assertion of the right to the stolen property which equates to proof of exclusive personal possession of said property. See *Todd v. State*, 601 S.W.2d 718, 720 (Tex.Crim.App. 1980) (defendant towed the stolen welder behind his pickup truck); *Kuczaj v. State*, 848 S.W.2d 284, 289 (Tex.App.-Fort Worth 1993, no pet.) (defendant pawned the stolen electronic equipment). Absent direct evidence that a defendant has made a verbal or written assertion of exclusive ownership or right to stolen property, typical trial evidence is simply descriptive of circumstantial proof of a defendant's exclusive and personal possession of the stolen property in question.

■■■■ Under the proper standard for reviewing a record for legally sufficient evidence, we must consider the record evidence in the light most favorable to the verdict, including all reasonable inferences therefrom. See *Jackson*, 443 U.S. at 318–19, 99 S.Ct. 2781, 61 L.Ed.2d at 573; *Sanders v. State*, 119 S.W.3d 818, 820 (Tex. Crim.App.2003). Although there was no direct evidence establishing the length of time that lapsed between the robbery and appellant's apprehension, the jury could reasonably infer that it was recent relative to the robbery. The testimony of Officer Herbert Otis indicated that he found appellant and Rice "kneeling in the sticker bush on the ground[,]" and Otis observed several $20 bills on the ground "just right underneath where they were. It appeared they may have been, like, almost sitting on them." In the light most favorable to the verdict, this appears to satisfy Hardesty and we are permitted to infer appellant's "possession" of the stolen items was personal and exclusive and, therefore, a circumstance of his guilt of the robbery in question. *Hardesty*, 656 S.W.2d at 77.

■■■■ Recall that Otis also stated that in searching "deep inside the sticker bush," he located a wallet which was later identified by Domino's employee Dwayne Rachal as having been taken from him by one of the gunmen during the robbery. In the light most favorable to the verdict, a rational jury could reasonably infer that this testimony indicated an attempt to conceal incriminating evidence, an indicator of knowledge of wrongful conduct which is also a circumstance of guilt. See *Guevara v. State*, 152 S.W.3d 45, 2004 WL 2347793, at *3 (Tex.Crim.App.2004).

■■■■ In summarizing the "light most favorable" evidence, the basic record facts indicate that two men were involved in the robbery and ran from the robbery scene, that an unspecified but presumably short-time later appellant and Rice were observed running from police, that appellant

and Rice were found kneeling in some bushes presumably attempting to conceal themselves from the police, and that cash and other items taken during the robbery were located within close physical proximity to appellant. From all of this we can say that a rational jury could have inferred the ultimate fact that appellant was one of the gunmen who committed the robbery of David Hoffpauir. See *Clewis,* 922 S.W.2d at 132 n. 10. We overrule issue one as to its legal sufficiency challenge.

## FACTUAL SUFFICIENCY REVIEW

■ The Court of Criminal Appeals has held that in a factual sufficiency review the courts of appeals are required to consider and discuss the most important evidence that the appellant claims undermines the jury's verdict. *Sims v. State,* 99 S.W.3d 600, 603 (Tex.Crim.App.2003). In keeping with the "common sense approach" suggested in Tex.R.App. P. 47.1, courts of appeals must "show their work" unless they have written a memorandum opinion. Id. at 603–04. As for appellant's position in this appeal, it is not so much a question of what "important evidence" exists in the record that undermines the jury's verdict, but the lack of such evidence. Under a factual sufficiency analysis all of the record evidence is considered in a neutral light, both for and against the finding. As we noted above, evidence weighing in appellant's favor included the fact that neither he nor Rice were dressed as were the gunmen, and that no trace of any clothing, masks, gloves, or weapons worn and carried by the gunmen was ever recovered despite the fact that two police officers and a scent-dog conducted a search of the area. Furthermore, appellant argues that "[t]here is no evidence in the record that Defendant had care[,] custody or control of the stolen items—or even that he could see them. For officers to need spotlights (RR3 P47 L19–20) to

see items as big as running people, it would be logical to assume that people in the dark would need more light to see small items inside a sticker bush." Appellants argument here is not persuasive. Had the stolen property been observed lying in the darkened street or on a highly-traversed, but darkened, public sidewalk, and no other evidence tied the stolen items to appellant other than close proximity, our conclusion might be different. See *Goodman,* 66 S.W.3d at 285 (cocaine found on sidewalk two feet from seated defendant with no one else in sight supports inference that cocaine belongs to defendant but facts too weak to support factual conclusion that defendant actually used or possessed cocaine). However, the facts indicate that appellant and Rice were attempting to hide from the police in the darkened area just inside the sticker bush, with some of the stolen property found directly underneath them, and other stolen items found deep inside the branches of the bush and located closely behind where the men were seated. There is no evidence that the particular location appellant and Rice were found was a "high crime area," or was located on a path or route typically traversed by residents in the neighborhood. Therefore, an inference that it was appellant who placed the stolen items on the ground and in the bushes is a logical consequence of the proven fact of appellant's presence in such an isolated and secretive place. A "permissible inference" of guilt would be rational under these facts and circumstances. *Hardesty,* 656 S.W.2d at 77. Appellant was found to have been virtually sitting on the property taken in the robbery while attempting to hide from the police a relatively short time and distance after the robbery was committed.

The Court in Zuniga framed the question in terms of what the jury was "ration-

ally justified" in finding beyond a reasonable doubt. Id. In the instant case, under all of the facts presented to it, the jury was rationally justified in finding appellant guilty of the aggravated robbery beyond a reasonable doubt. Issue one is overruled as to its factual sufficiency challenge. The judgment of the trial court is affirmed.

AFFIRMED.

DON BURGESS, Justice, concurring and dissenting.

I concur with the majority's resolution of issues two, three and the legally sufficient portions of issues one and four. I respectfully dissent to the factual sufficiency analysis and conclusion.

As noted by the majority, the State acknowledges the sole basis for identifying Louis as one of the robbers is his close proximity to property identified as having been taken during the robbery. The record confirms this. There is no testimony that links the man Officer Schexnider saw running from the scene of the robbery to the two men spotted by Officer Harrison, one of whom was later identified as Louis, running in the alleyway across his perimeter position.

I agree with the majority the sufficiency of the evidence in this case will turn on the long-standing common-law rule involving "unexplained personal possession of recently stolen property."[3] See *Hynson v. State*, 656 S.W.2d 460, 460–61 (Tex.Crim. App.1983). As the majority notes, from our quote in *Rogers v. State*, 929 S.W.2d 103, 108 (Tex.App.-Beaumont 1996, no pet.), in order to rely on Hardesty's "permissible inference," the actor must have been in "personal possession" of the stolen property at some point. An early case,

*Frazier v. State*, 88 Tex.Crim. 411, 227 S.W. 324 (1921), involved the identity of the thief of some hogs. The evidence in Frazier indicated the stolen hogs were apparently found dead lying in the front yard of the residence of the defendant's mother. Id. at 325. The witness who spotted the dead hogs in the front yard also observed the defendant and his brother leave the house, and also observed another man and woman:

> Without discussing the question of the sufficiency of the identification of the alleged stolen property, it seems from the record that, at the house in whose yard the witness King said he found the dead hogs, there were four people, none of whom claimed to own the hogs or have same in their possession. Possession appears to be the only circumstance of guilt, and in order to justify such inference the possession must not only be shown to be recent and unexplained, but also personal and exclusive in the party or parties sought to be charged thereby. The discovery of the alleged stolen property in the presence of a group of people, one of whom is the accused, unaccompanied by evidence of an acting together and thus of guilt as a principal or accomplice on the one hand, or of evidence which satisfactorily fixes possession in the person charged, would not support a conviction for theft as to anyone of the said persons. That guilt as to one cannot be predicated on the mere presence of the group, and a general impersonal possession arising therefrom, seems too well settled to need discussion. Section 2463, Branch's Annotated Penal Code, and authorities there cited. We find nothing in this record showing any claim of ownership

See *Rogers v. State*, 929 S.W.2d 103, 108 n. 2 (Tex.App.-Beaumont 1996, no pet.).

---

**3.** The doctrine appears to have been misused over the years by various courts of appeals as well as by the Court of Criminal Appeals.

or possession of said hogs by this appellant, either in the testimony of the state or that of the defense.

Id.

The "unexplained personal possession of recently stolen property" inference in theft cases, as mentioned in Frazier, was extended to robbery cases in *Batiste v. State*, 464 S.W.2d 149, 151 (Tex.Crim.App.1971). In Batiste, the complainant testified he was walking down a street at about 12:50 a.m. when. two Black men robbed him at knifepoint of his eyeglasses, transistor radio, and wallet. Id at 150. The complainant heard one of the men say, "Come on, the cops," and further observed the men run away. Id. However, because of poor eyesight, the complainant was unable to identify either of the robbers. Id. at 150–51. Approximately five minutes later, a police officer observed two men behind a closed business. Id. at 150. When the officer illuminated the area, the men fled. The two men were apprehended a short time later and a knife was found on one of the men, later identified as the defendant. Id. The defendant was arrested and, while seated in the patrol vehicle, was observed by another officer trying to gain access to his own pant's pocket. When the officer checked the pocket, a pair of eyeglasses, later identified by the complainant as the glasses taken by the robbers, was found. Id. The defendant in Batiste was convicted and raised insufficient evidence on appeal. Id. at 150. The Court analyzed the issue in the following manner:

> In *Edmonds v. State*, Tex. Cr.App., 407 S.W.2d 783, this Court reiterated the rule that 'proof of appellant's unexplained possession of the property recently stolen from the house, together with proof that the house had been burglarized by someone, was sufficient to support the conviction.'

Unexplained possession of recently stolen goods has been held to support a conviction for theft in numerous cases. *English v. State*, Tex. Cr.App., 441 S.W.2d 195; *Stubblefield v. State*, Tex. Cr.App., 372 S.W.2d 539.

> 'This court has frequently said that robbery is an aggravated case of theft because in each instance the fraudulent taking of property with intent to appropriate it is the gravamen of the offense. * * * The distinction between the two offenses lies in the antecedent assault or violence or putting in fear of life or bodily injury necessary to constitute the offense of robbery.' *Alaniz v. State*, 147 Tex. Cr.R. 1, 177 S.W.2d 965.

> 'As in cases of burglary and theft, it would seem that a conviction of the defendant for robbery could well rest upon the fact that he was in possession of the loot which had recently been taken from the injured party.' 5 *Branch's P.C.*2d, Sec. 2596, pp. 29—30.

> Under the circumstances of this case, where a robbery has occurred at a location near the arrest and very close to the time of the arrest, and where the victim is unable to identify the robber, appellant's unexplained possession of the victim's eyeglasses at the time of his arrest is sufficient to sustain his conviction for the robbery by assault.

*Batiste*, 464 S.W.2d at 151. Ignoring Batiste's use of a presumption of guilt rather than the Hardesty "permissible inference" of guilt, the facts in Batiste underscore the problem with the facts in this case. Simply put, "personal and exclusive possession" is a given under the facts of Batiste because the fruits of the robbery—complainant's eyeglasses—were found in the defendant's pants pocket.

In this case, as Louis points out, "[t]here is no evidence in the record that Defendant had care[,] custody or control of the stolen items -or even that he could see them. For officers to need spotlights ... to see items as big as running people, it would be logical to assume that people in the dark would need more light to see small items inside a sticker bush." In Batiste, the Court found the evidence to be sufficient to sustain the conviction absent a positive identification by the complainant because the defendant's personal possession of the complainant's property taken in the robbery was also recent, and unexplained. Id. at 151.

In another robbery case, *Girard v. State*, 631 S.W.2d 162 (Tex.Crim.App. 1982), three robbers were involved, only one of whom was masked and wore gloves. Id. at 163. The State's theory was the defendant was the masked man even though the complainant could not identify the masked man, but could say that appellant was of a similar height and build. Id. The evidence indicated that approximately forty to forty-five minutes after the robbery the defendant was seen in possession of jewelry taken in the robbery. Id. Some of the jewelry was given to a third party, Bogard, by the defendant. Id. It was later proven that Bogard was also a friend of one of the un-masked robbers (Barnes). Id. at 164. In finding the evidence legally sufficient to support the conviction, the Court in Girard stated:

> In this case, the fact that the appellant was shown by Bogard's testimony to have been in possession of the loot so soon after the robbery was an inculpatory circumstance. Generally, the shorter the interval between the theft and the possession, the stronger is the circumstance (although the cases will vary according to such factors as the ease with which such property can be transferred). See *Hardage v. State*, 552 S.W.2d 837,

840 (Tex.Cr.App.1977). We hold that this very recent unexplained possession, together with the fact of the similarity of appearance and the fact that the appellant was a companion of at least on of the unmasked robbers, was sufficient evidence of guilt. *Cf. Batiste v. State*, 464 S.W.2d 149, (Tex.Cr.App.1971) (proof was sufficient when a man, whom the victim could not identify other than by race, was found nearby in possession of stolen property shortly after robbery).

*Girard*, 631 S.W.2d at 164. Again, in Girard there was no question the defendant was in exclusive and personal possession of property taken from the robbery. In addition to this fact, the Girard jury had evidence the masked robber was similar in height and build to the defendant, and the defendant was tied to the un-masked robber Barnes by Barnes' friendship with the defendant's friend Bogard.

In this case, there is no attempt to match Louis's physical appearance with either of the men who robbed Hoffpauir or any of the other pizza employees. Nor was there an attempt to match the physical appearance of John Rice, the man arrested with Louis, with that of either robber.

The majority notes that under certain circumstances actions of a defendant may show a conscious assertion of the right to the stolen property which equates to proof of exclusive personal possession of said property, citing *Todd v. State*, 601 S.W.2d 718, 720 (Tex.Crim.App.1980) (defendant towed the stolen welder behind his pickup truck) and *Kuczaj v. State*, 848 S.W.2d 284, 288–89 (Tex.App.-Fort Worth 1993, no pet.) (defendant pawned the stolen electronic equipment). However, other than evidence that a defendant has made a verbal or written assertion of exclusive ownership or right to stolen property, the evi-

dentiary circumstances in Batiste, Girard, Todd, and Kuczaj are descriptive of circumstantial[4] proof of the defendants' exclusive and personal possession of the stolen property in question. In Batiste, the victim's property was in the defendant's own pant's pocket; in Girard, the defendant made his friend Bogard a "Christmas present" of the stolen jewelry; in Todd, the defendant was towing a stolen welder attached to his pickup truck; and in Kuczaj, the defendant was identified by his driver's license and name on the pawn ticket which included the serial numbers of the items stolen in a burglary of the victims' home, with the date of the burglary being the same as the date the stolen items were pawned.

In this case, the evidence indicates Louis and Rice were found kneeling on the ground in the dark under some bushes in an apparent attempt to hide from police from whom they had been running. Found nearby were items taken in the robbery. Other than very close physical proximity to the stolen items, no other evidence from the robbery was ever located and nothing linking either Louis or Rice to the robbery was presented to the jury. There is no evidence that either Louis or Rice made any remarks with regard to the stolen items nor does the record indicate the police asked for any explanation.[5] Although probative of wrongful conduct as well as circumstances of guilt, there are no inconsistent statements by Louis or Rice, nor did either man give any implausible explanation to the police when apprehended amidst the stolen property. See

United States v. Cano–Guel, 167 F.3d 900, 905 (5th Cir.1999); Graham v. State, 566 S.W.2d 941, 951 (Tex.Crim.App.1978).

Recall that under a factual sufficiency analysis all of the record evidence is considered in a neutral light, both for and against the finding. Without the "light most favorable" viewpoint, the record in this case is missing many items of circumstantial evidence typically used to prove identity. I reiterate that the record does not have any physical comparison between the gunmen and either appellant or Rice. Moreover, there is no direct evidence as to the race of either Louis or Rice. One may surmise from a reading of the testimony of Officer Schexnider that having seen a "male black" race past him, and later stating that "they" were eventually found, Louis and Rice were both Black. However, this is not as solidly established as is typical in cases where identity of the perpetrator is hotly contested. Furthermore, the record is silent as to any relationship between Louis and Rice other than the fact that they just appeared together running at some point and were apprehended kneeling in the dark under the "sticker bush." The record is also silent as to whether Louis or Rice were given the opportunity to explain the circumstances surrounding their apprehension including their awareness, if at all, of the presence of the stolen property near them. This fact severely water's down the circumstance of guilt a fact finder is permitted to draw from exclusive and personal possession of recently stolen property.

4. "Circumstantial evidence is 'direct proof of a secondary fact which, by logical inference, demonstrates the ultimate fact to be proven.'" See Cowan v. State, 840 S.W.2d 435, 438 n. 10 (Tex.Crim.App.1992) (quoting Taylor v. State, 684 S.W.2d 682, 684 (Tex.Crim. App.1984)).

5. It has been held that application of Hardesty's permissible inference does not violate the due process requirements of the federal constitution. See Barnes v. United States, 412 U.S. 837, 846, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973); Jackson v. State, 12 S.W.3d 836, 839 (Tex.App.-Waco 2000, pet. ref'd). References

Recently, the Court of Criminal Appeals held, in a capital murder case, the evidence was factually insufficient to support the jury's verdict that the defendant was guilty as a party to the offense. See *Vodochodsky v. State*, No. 74129, 2004 WL 840121 (Tex.Crim.App. April 21, 2004) (publication pending). There is value in the Vodochodsky opinion, not for its party-liability discussion, but for the contrasting analyses the Court utilizes in discussing the legal and factual insufficiency issues. The Court applies the record-evidence to its factual sufficiency review standard as follows:

> In this case, the overwhelming weight of the evidence mitigates against the conclusion that Vodochodsky solicited, encouraged, directed, aided or attempted to aid Engleton in committing the offense. All of the evidence that could legally support a rational jury's conclusion is nevertheless so weak that our confidence in the jury's verdict is undermined. When Engleton expressed a desire to "do it right now" and Vodochodsky told him they did not yet have a plan, neither man specifically mentioned killing a peace officer. When Vodochodsky told Essary that he bailed Engleton out of jail "to do this," he did not specifically state that he bailed him out as part of a plan to kill police officers. Vodochodsky removed belongings from the house, but there is no proof that he did so as part of a murderous plot. And Vodochodsky's comment to Essary that Engleton had "gone over the edge" when he took the deputy's gun could just as reasonably have been a speculative comment, not one indicating that Vodochodsky had witnessed Monse's murder.
>
> Indeed, none of that evidence necessarily suggests that Vodochodsky acted with intent to promote or assist Engleton. None of his statements directly refer to killing police officers. His statements are devoid of information on the details of the alleged murder plot, and there is no other information in the record suggesting that Vodochodsky was planning the event with Engleton.
>
> Furthermore, other evidence suggests that Vodochodsky was not working with Engleton. His whispered warning to Sara could indicate that while he may have known of Engleton's plan, he was not a party to it. He did not participate in the purchase of ammunition. There is no evidence that Vodochodsky actually did any affirmative act to assist Engleton with the plan. Instead, Vodochodsky had the bad luck of being the friend and roommate of a man determined to kill police officers and himself.
>
> We conclude that proof of Vodochodsky's guilt was so weak as to undermine confidence in the jury's determination. The evidence was factually insufficient to convict.

Id. at *6.

For brevity's sake, I have dispensed with a detailed rendition of the facts in Vodochodsky. However, as can be gleaned from the above-quoted portion, Engleton was the primary actor/murderer and the defendant's role in the murders of two sheriff's deputies and a state trooper by Engleton was the key issue. At any rate, contrast the Court's factual sufficiency analysis set-out above with the legal sufficiency analysis as it appears in the opinion:

> The night before the offense, Engleton expressed a desire to "do it right now" and Vodochodsky told him they did not yet have a plan. A rational jury could conclude from this evidence that Engleton had a plan to kill a peace officer, that Vodochodsky was aware of Engleton's plan, and the Vodochodsky wanted to wait until the plan was fool-

proof. On the day of the crime, Vodochodsky bailed Engleton out of jail, later telling Essary that he bailed him out "t do this." A rational jury could conclude from this evidence that Vodochodsky bailed Engleton out of jail specifically to carry out the plan to kill the peace officers. Knowing that the police were coming and knowing that Engleton intended to commit suicide after his killing spree, Vodochodsky took many items from the house. A rational jury could conclude from this evidence that Vodochodsky sought to help Engleton wrap up his affairs as part of his participation in the plan. Finally, Vodochodsky commented to Essary after the crime that he knew that Engleton had "gone over the edge" when he took the deputy's gun. A rational jury could conclude from this evidence that Vodochodsky was still at the residence and witnessed at least Monse's murder, despite any claims to the contrary.

In light of this evidence, we hold that a rational jury could have found beyond a reasonable doubt that Vodochodsky acted with an intent to promote or assist Engleton in committing this offense.

Id. at *5–*6.

In comparing the two analyses, it is fascinating to note that when the "light most favorable to the verdict" is switched off for factual sufficiency purposes, the incriminating nature of the evidence vis-a-vis Vodochodsky essentially disappears. No longer are any incriminating inferences, rational or otherwise, placed upon the identical facts that are alluded to in the legal sufficiency analysis. Indeed, evidence that, during a telephone conversation in the presence of Engleton, Vodochodsky whispered to his girlfriend, Sara Lopez, not to come to the house, led to the somewhat exculpatory view by the Court as possibly indicating Vodochodsky may have known of Engleton's plan to kill the law enforcement personnel but "was not a party to it." Id. at *6.

For factual sufficiency purposes, the evidence in this case appears to be weaker than the evidence in Vodochodsky. As admitted by Officer Harrison the actual gunmen could have slipped through the perimeter and gotten away, and that it is not uncommon for Black men to run from the Port Arthur police for a variety of reasons. Under the Zuniga standard, evidence of guilt can indeed "preponderate" in favor of conviction but still be insufficient to prove the elements of the crime beyond a reasonable doubt. *Zuniga v. State,* 144 S.W.3d 477, 485 (Tex.Crim.App. 2004). "[E]vidence supporting guilt can 'outweigh' the contrary proof and still be factually insufficient under a beyond-a-reasonable-doubt standard." Id. As did the Court in Vodochodsky, one can find that all of the evidence can legally support a rational jury's conclusion, yet is nevertheless so weak that a court's confidence in the jury's verdict is undermined under the guilt-beyond a-reasonable-doubt standard.

I would sustain the factually insufficient portion of issues one and four and remand for a new trial. Id. at 482.